Kimberlee A. Rode (State Bar No. 186132)
Law Office of Kimberlee A. Rode
9284 Jackson Road
Sacramento, CA  95826
Telephone: (916) 417-4564
Facsimile: (916) 244-7006

Attorney for Plaintiff Jerry Sam and Melenie Sam

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Jerry Sam and Melenie Sam,<br><br>             Plaintiff,<br><br>      and<br><br>American Home Mortgage Servicing, Inc.,<br><br>Deutsche Bank  National Trust Company, as<br><br>Trustee for the Certificateholders of<br><br>Soundview Home Loan Trust 2006-OPT3,<br><br>Asset-Backed Certificates, Series 2006-OPT3<br><br>and LENDER DOE<br><br>             Defendants. | Case No.:  2:09-cv-02177-LKK-KJM<br><br>FIRST AMENDED COMPLAINT FOR DAMAGES AND FOR INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL<br><br>1.   Truth In Lending Act Violations<br>2.   RESPA Violations<br>3.   Fair Debt Collection Practices Act Violations<br>4.   Violations Of California Business & Professions Code § 17200<br>5.   Slander [Libel] of Credit<br>6.   Breach of Covenant of Good Faith and Fair Dealing.<br>7.   Slander [Libel] of Title |

## I. INTRODUCTION

1.      This is an action pursuant to the Truth in Lending Act ("TILA"), 15 U.S.C. §1601, et seq.,

Bus. & Prof. Code § 17200, et seq., and other statutory and common laws in effect. Plaintiff Jerry

Sam and Melenie Sam ("Plaintiff"), brings this action against American Home Mortgage Servicing,

Inc. ("AHMS"), Deutsche Bank  National Trust Company, as Trustee for the Certificateholders of

Soundview Home Loan Trust 2006-OPT3, Asset-Backed Certificates, Series 2006-OPT3

("DEUTSCHE") and LENDER DOE ("DOE"), based, in part, on Defendants failure to properly

respond and address the rescission request of the loan of Plaintiff pursuant to the Truth In Lending Act subjecting Plaintiff to damages.

2.      Specifically, Defendants AHMS, Deutsche Bank  National Trust Company, as Trustee for the Certificateholders of Soundview Home Loan Trust 2006-OPT3, Asset-Backed Certificates, Series 2006-OPT3, LENDER DOE and/or predecessor, Proffer Financial, failed to properly provide two copies each of the Notice of Right to Cancel to plaintiff in violation of 12 C.F.R. §226.23, Reg. Z §226.4(a)(2)-1 and Reg. Z §226.4(b)(2). This failure gave the Plaintiff 3 years to rescind the loan pursuant to Reg. Z 226.23.  Upon notification of Plaintiff's exercise of his rescission request, Defendants failed to act on the request which damaged Plaintiff.

3.      Defendant AHMS failed to comply with the Federal Real Estate Settlement Procedures Act by properly responding to a Qualified Written Request.  12 U.S.C. §2605.

4.      Defendant AHMS failed to comply with California Business and Professions Code §17200 et seq. by untimely responding to the Plaintiff's request for rescission, willfully failing to provide the name, address and telephone number of the owner of the obligation and systematically failing to act in any good faith with the Plaintiff's requests.

5.      Defendant AHMS failed to comply with State Fair Debt Collection Practices by continually contacting Plaintiff after Plaintiff had requested the contact stop pursuant to State law.

6.      Defendants failed to comply with California Business and Professions Code §17200 et seq. by untimely responding to the Plaintiffs request for rescission, willfully failing to provide the name, address and telephone number of the owner of the obligation, proceeding to filing a foreclosure sale without even addressing the Plaintiffs claim and systematically failing to act in any good faith with the Plaintiff's requests.

///

///

///

## II. JURISDICTION

7.     Subject Matter Jurisdiction is conferred on this Court by 15 U.S.C. § 1640(e) and 28 U.S.C. §§ 1331, 1337. The Court has authority to issue a declaratory judgment by virtue of 28 U.S.C. § 2201.

8.     The Court has supplemental jurisdiction over the Plaintiffs state law claims pursuant to 28 U.S.C. § 1367.

9.     This Court has personal jurisdiction over the parties in this action by the fact that Defendants are either individuals who reside in this District within California or are corporations duly licensed to do business in California.

10.     Venue is proper within this District and Division pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this district, and because there is personal jurisdiction in this district over the named Defendants because it regularly conducts business in this judicial district.

## III. PARTIES

11.     The Plaintiff, Jerry Sam and Melenie Sam, are natural persons, (hereinafter referred to as "SAM") and was at all times relevant, residing at 9535 Palazzo Drive, Stockton, CA  95212  (the "Subject Property").

12.     Plaintiff believes that Defendant American Home Mortgage Servicing, Inc. (AHMS) is, or at all times relevant to this action, a corporation with a mailing address of 4600 Regent Blvd., Suite 200, Irving, TX  75063.

13.     Plaintiff believes that Defendant Deutsche Bank  National Trust Company, as Trustee for the Certificateholders of Soundview Home Loan Trust 2006-OPT3, Asset-Backed Certificates, Series 2006-OPT3 (DEUTSCHE) is, or at all times relevant to this action, a corporation with a mailing address of 60 Wall Street, New York, NY 10005.

14.     DEUTSCHE provides banking and bank-eligible securities services.

15.     Plaintiff believes that Defendant LENDER DOE was, or at all times relevant to this action was, a domestic corporation, business entity, and/or a "Doing Business As" entity.  Plaintiff does not know the true name of LENDER DOE as Defendant AHMS has willfully failed to identify LENDER DOE for whom they service the loan and Plaintiff will amend this complaint once the identity of LENDER DOE is discovered.

### IV. PRELIMINARY ALLEGATIONS

16.     On or about March 6, 2006, Plaintiff entered into a consumer credit transaction, a first deed of trust in the amount of $488,000.00 (AHMS servicing Loan Number 0021014790)  (referred to as "Loan Transaction") with Proffer Financial in which the extended consumer credit was subject to a finance charge and which was initially payable to Proffer Financial.  A true and correct copy of the Note and security instrument (Deed of Trust) provided to Plaintiff by Proffer Financial is attached as Exhibit "A" .

17.     Proffer Financial was required to provide Plaintiff certain disclosures pursuant to the TILA and Reg. Z.

18.     Plaintiff's loans are subject to the federal Truth in Lending Act, 15 U.S.C. § 1601 et seq., ("TILA") and its implementing regulations, 12 C.F.R. Part 226 ("Reg. Z") as Proffer Financial was a "creditor" pursuant to said Act.

19.     TILA grants a consumer a three-day right to cancel certain types of real estate loan transactions.  This three-day right to cancel applies to Plaintiff's loans with Proffer Financial now serviced by AHMS since the transaction was on the Plaintiff's principal residence and was a refinance transaction.

20.     Pursuant to 15 U.S.C. § 1635(a), the three-day cancellation period begins upon the later of the following events: (1) the "consummation of the transaction;" (2) the "delivery of the information and rescission forms" required by that section; or (3) delivery of accurate "material disclosures" required by TILA. 15 U.S.C. § 1635(a).

21.     If the required notices of cancellation (Notice of Right to Cancel) are not provided or provided inaccurately, then the right to cancel extends to three years after the date of the loan. 15 U.S.C. § 1635(f).

22.     If a consumer has the right to rescind against a creditor, the right will also apply to any assignees of that creditor. 15 U.S.C. § 1641(c).

23.     A consumer may exercise their right to cancel a transaction by delivery of a written notification of the consumer's wish to cancel the transaction to the creditor's place of business or upon notice to the assignee of the creditor.

    a.   A consumer may use the form provided by the creditor or any written statement.

    b.   The form promulgated by the Truth In Lending Act merely states, "I Wish to Cancel".

24.     Notice is effective upon mailing and notice on the agent servicing the loan is effective notice on the holder of the mortgage. 12 C.F.R. § 226.23(a)(2).

25.     When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer is not liable for any amount, including any finance charge. 15 U.S.C. § 1635(b).

26.     Within twenty (20) days after the receipt of a consumer's election to cancel the transaction, the creditor must return to the consumer all money or property given, including all interest and finance charges paid, and shall take all action necessary or appropriate to reflect the termination of any security interest created under the transaction. 15 U.S.C. § 1635(b); 15 C.F.R. § 226.23(d).

27.     Pursuant to the Official Staff Commentary to Regulation Z 226.23(d)(1), the security interest becomes void when the consumer exercises the right of rescission and the security interest is automatically negated:

> *Termination of security interest.  Any security interest giving rise to the right of rescission becomes void when the consumer exercises the right of rescission. The security interest is <u>automatically negated</u> regardless of its status and whether or not it was recorded or perfected. Under § 226.23(d)(2), however, the creditor must take any action necessary to reflect the fact that the security interest no longer exists.*

28.     Pursuant to the Official Staff Commentary to Regulation Z 226.23(d)(3), the creditor must take steps to indicate that the security interest is terminated within the 20 day response period after receiving the consumers request to rescind.  The creditor must begin the process within the 20 day period and is solely responsible for ensuring the process is completed:

> *Reflection of security interest termination.  The creditor must take whatever steps are necessary to indicate that the security interest is terminated. Those steps include the cancellation of documents creating the security interest, and the filing of release or termination statements in the public record. In a transaction involving subcontractors or suppliers that also hold security interests related to the credit transaction, the creditor must insure that the termination of their security interests is also reflected. The 20-day period for the creditor's action refers to the time within which the creditor must begin the process. It does not require all necessary steps to have been completed within that time, but the creditor is responsible for seeing the process through to completion.*

29.     By a letter dated February 3, 2009 (Exhibit "B" attached and incorporated herein by reference), Plaintiff notified Proffer Financial and AHMS (and DEUTSCHE and LENDER DOE through their agent AHMS) that they were making a Qualified Written Request under RESPA, pointed out the deficient notice of right to cancel under the Truth In Lending Act and that Plaintiff was rescinding the loan pursuant to the Truth In Lending Act.

30.     Proffer Financial was required to provide Plaintiff with two copies each of a completed Notice of Right to Cancel at the time of consummation or at the time of giving the final disclosures.

31.     Proffer Financial violated TILA by failing to provide Plaintiff with two copies of their Notice of Right to Cancel on each loan.

32.     Said failure to provide the proper notices allows Plaintiff to rescind the loans as to the assignees, Defendants herein.

33.     While Plaintiff believes that AHMS is a servicing agent for a securitized pool, as of the date of this filing, we believe that AHMS is jointly and severely liable for damages related to this action as they have failed to identify their principal (for whom they act as agent for).

a.  The only reason Plaintiff is aware of defendant DEUTSCHE is due to their appearance in a bankruptcy case and it is believed based on that appearance that DEUTSCHE may be the lender in this case.

34.  Plaintiff contends that under common law and Restatement of Agency, if an agent has actual or apparent authority, the agent will not be liable for acts performed within the scope of such authority, so long as the relationship of the agency and the identity of the principal have been disclosed. When the agency is undisclosed or partially disclosed, however, both the agent and the principal are liable.

35.  Plaintiff was a debtor under Chapter 7 of the Bankruptcy Code.  On July 31, 2009, Plaintiff was granted a discharge.  A true and correct copy of the discharge is attached as Exhibit E.

**FIRST CAUSE OF ACTION TRUTH IN LENDING ACT**
**FOR RESCISSION AND DAMAGES AGAINST ALL DEFENDANTS**
**(Violations of Truth in Lending Laws)**
**(Damages pursuant to 15 U.S.C. §1635(g) and 15 U.S.C. §1640)**
**(Order directing AHMS to comply with 15 U.S.C. § 1641)**

36.  Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

37.  15 U.S.C. § 1601, et seq., is the Federal Truth in Lending Act ("TILA"). The Federal Reserve Board of Governors implements the Federal Truth in Lending Act through Regulation Z (1C.F.R. § 2) and its Official Staff Commentary. Compliance by lenders with Regulation Z became mandatory October 1, 1982. Likewise, Official Staff Commentary issued by the Federal Reserve Board is also binding on all creditors.

38.  The purpose of TILA is to protect consumers. This is stated in 12 C.F.R. § 226.1, which reads:

*§ 226.Authority, purpose, coverage, organization, enforcement and liability... (b) Purpose. The purpose of this regulation is to promote the informed use of consumer credit by requiring disclosures about its terms and costs. The regulation also gives consumers the right to cancel certain credit transactions that involve a lien on a consumer's principal dwelling.*

39.  Reg. Z also mandates very specific disclosure requirements regarding home loans with which

creditors, must comply (if they fail to do so, <u>assignees are only liable for rescission and for damages related to their failure to act on the rescission</u>):

> § 226.17. General disclosure requirements. (a) Form of disclosures. (1) The creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep. The disclosures shall be grouped together, shall be segregated from everything else, and shall not contain any information not directly related to the disclosures required under § 226.18.

40.    AHMS failed to comply with Plaintiff's request for the name, address and telephone number of the true note holder as requested in the Plaintiff's February 3, 2009 (Exhibit B) letter pursuant to 15 U.S.C. § 1641.

41.    AHMS has held itself out as the note holder and keeping the identity of the true note holder from Plaintiff which Plaintiff believes is a fraudulent act as they are making an intentional misrepresentation and actively concealing known the fact:

    a.    AHMS is required to disclose said information pursuant to 15 U.S.C. § 1641.

    b.    AHMS was not the true note holder at the time requested and recklessly claimed it was, knowing it was not true.

    c.    AHMS knew that Plaintiff would rely on said statements as fact thereby believing any remedy they proposed was done so by the true note holder.

    d.    Plaintiff was not aware that said representation was false.

    e.    Plaintiff has been harmed in that they have had to bring this action to enforce their rights and will continue to be harmed until they can obtain the name and contact information of the true owner of the note through discovery.

42.    While Plaintiff believes that AHMS is merely a servicing agent at the time of filing this complaint, their true role is unknown and they could be a servicing agent, lender, have an interest in the subject loan and are intentionally keeping their true role a mystery despite Plaintiff's request as a Qualified Written Request.

43.    Generally, a servicing agent does not have liability under the Truth In Lending Act but

Plaintiff does believe they have liability under common law (Restatement of Agency), because if an agent has actual or apparent authority, the agent will not be liable for acts performed within the scope of such authority, so long as the relationship of the agency and the identity of the principal have been disclosed. When the agency is undisclosed or partially disclosed, however, both the agent and the principal are liable.  As alleged herein, AHMS is intentionally withholding the identity of their principal thereby rendering themselves liable for their acts.

44.     Effective May 20, 2009, Public Law 111-22, Helping Families Save Their Homes Act of 2009, was signed into law by President Obama to address the difficulties homeowners are having in securing from servicing companies who actually owns their loans.

45.     Public Law 111-22 requires that creditors identify the creditors they assign loans to and impose liability on servicers who do not disclose the identity of the owners of the obligations they service loans for.  AHMS has willfully failed to comply with Public Law 111-22.

46.     Pursuant to 15 U.S.C. 1641, any civil action that may be brought against any creditor may also be brought against any assignee of the creditor.

     a.     Typically such liability is limited to errors apparent on the face of the disclosure statement (15 U.S.C. 1641(e).

     b.     However, 15 U.S.C. 1641(c) states that the assignee is subject to the rescission rights of the consumer even if there was not any error apparent on the face of the disclosures.

47.     On February 3, 2009 (Exhibit B) Plaintiff notified AHMS, DEUTSCHE and LENDER DOE's agent, that the only copies of the Notice of Right to Cancel they have ever received prior to filing this complaint were the blank copies attached to their letter.

48.     Plaintiff never received any advance copies of documents before closing and the only copies they have received are the ones provided them by the closer after signing the closing documents.

49.     DEUTSCHE AND LENDER DOE's loan to plaintiff violates TILA because Proffer Financial failed to provide the Plaintiff the required two copies each of the Notice of Right to

Cancel for the Plaintiff's loan with the accurate information as required by the statute.

50.    As a result of the failure to provide accurate and true copies of the Notice of Right to Cancel for the Loan Transaction, Plaintiff was entitled to the extended three year right to rescind the Loan Transaction and did in fact exercise that right.

*51.*    Plaintiff contends that upon receipt of the Notice of Right to Cancel, the next steps required were required by Defendants.  Specifically, the Official Staff Commentary to Regulation Z states under § 226.23(d)(3):

> *Reflection of security interest termination.  The creditor must take whatever steps are necessary to indicate that the security interest is terminated. Those steps include the cancellation of documents creating the security interest, and the filing of release or termination statements in the public record. In a transaction involving subcontractors or suppliers that also hold security interests related to the credit transaction, the creditor must insure that the termination of their security interests is also reflected.* ***The 20-day period for the creditor's action refers to the time within which the creditor must begin the process. It does not require all necessary steps to have been completed within that time, but the creditor is responsible for seeing the process through to completion.***

52.    Plaintiff contends that Defendant did not begin the process as stated above and did not make a request for tender but instead ignored the request and filed a foreclosure and forced the Plaintiff into bankruptcy and demanded an amount substantially more (in the Notice of Default and documents filed in the bankruptcy proceeding) than the amount required to be tendered under the Truth In Lending Act.

53.    By failing to act on the rescission request within the 20 days as required by 15 U.S.C. §1635, Plaintiffs was additionally harmed by the reduction in property value impacting the Plaintiffs ability to tender.

54.    In addition, AHMS is reporting the credit of Plaintiff negatively which is additionally harming Plaintiff's ability to tender as part of his ability to tender will require a refinance.

55.    Plaintiffs was prepared to tender from a refinance and from funds from savings once the amount to tender was known but Defendants did not do the things they were required to do under TILA but instead filed a Notice of Default and forced the Plaintiff into bankruptcy.

56.     In effect, Defendants put every impediment in the way to prevent a tender completely inconsistent with the rescission requirements of 15 U.S.C. §1635.

    a.   Defendants know that by not acting on the request in a declining market causes further harm to Plaintiff and their ability to tender.

    b.   Defendants are reporting a loan delinquency on this loan to the credit bureaus when they know that by reporting the negative credit, the Plaintiff's ability to tender will become much more difficult.

    c.   Defendants have not told Plaintiff the amount they deem is necessary to tender.

    d.   Plaintiff contends that Defendants are is engaging in an unlawful and unfair manner, as stated herein, knowing they will make tender a major issue of the rescission request thereby systematically rewarding their bad behavior of not acting on the request required within the law and foreclosing on the property even though their actions were intended to further harm Plaintiff.

57.     Plaintiff is ready, willing and able to tender upon knowing the amounts required to tender, including offsets for damages as pled herein, by a combination of a refinance and financial assistance from family members.

58.     Plaintiffs was denied rescission and damaged under 15 U.S.C. §1640 and were forced to file this suit to address Defendants failure to do their part under the rescission process.

    a.   Damages include, but are not limited to, loss in value of the subject property from the time Defendants were required to act on the rescission request and the ultimate time tender will be completed.

59.     Plaintiff alleges that the improper providing of rescission forms is a prevalent problem in the lending industry, known by AHMS, DEUTSCHE,  LENDER DOE and Proffer Financial, of which they willfully fail to put in place proper controls to ensure their obligations under the Truth In Lending Act, i.e. providing rescission rights and notices, is met by the agents and the predecessors

in interest they employ.

      a. Creditors and assignees routinely claim that the providing of completed copies to consumers are mere technical violations.

      b. Plaintiff contends that creditors and assignees compliance with providing proper and completed rescission forms to consumers is a relatively simple task with proper controls but that creditors and assignees are negligently failing to meet their obligations.

60.    Plaintiff further contends, while not their responsibility but the responsibility of the creditor, they lack the proper expertise to properly calculate business days as on information and belief, business day for rescission purposes is different than a lay persons belief of what a business day is and therefore needs a complete form with the actual dates completed to be given proper disclosure of when their right to cancel begins and ends.

61.    Plaintiff further contends that Defendants keep the loan closing process complicated and use agents to meet Defendants requirements which provide the Plaintiff a stack of documents approximately one inch thick in which the Plaintiff executes the documents and are promised copies at the closing.  A review of the extensive copies provided at the closing has the appearance of being true and complete copies but the copies provided the Plaintiff herein appear are made in advance without them completed.

      a. Plaintiff has exercised common and ordinary care as is typical of an average consumer in reviewing the copies provided for the limited time involved.

      b. Plaintiff lacks the experience to review the copies provided without specifically reviewing side by side each document to ensure each page executed matches the corresponding page of each copy which, considering the agent controlling the closing has promised copies, is not reasonable and substantially exceeds the standard of care of an ordinary consumer would exercise especially considering this shifts the responsibility of

providing the proper copies to the Plaintiff from Defendants (or their predecessor)  (who are required to ensure compliance) back to the consumer, the Plaintiff herein.

62.     The statute and regulation specify that the security interest, promissory note or lien arising by operation of law on the property becomes automatically void. (15 U.S.C. § 1635(b); Reg. Z §§ 226.15(d)(1), 226.23(d)(1).   As a damage under 15 U.S.C. §1640, Plaintiff requests damages equal to that which Plaintiff would have received if Defendant complied with 15 U.S.C. §1635.

63.     As noted by the Official Staff Commentary, the creditor's interest in the property is "automatically negated regardless of its status and whether or not it was recorded or perfected." (Official Staff Commentary §§ 226.15(d)(1)-1, 226.23(d)(1)-1.).

64.     The security interest is void and of no legal effect irrespective of whether the creditor makes any affirmative response to the notice. Also, strict construction of Regulation Z would dictate that the voiding be considered absolute.

65.     Non-compliance with the rescission request is a violation of the act which gives rise to a claim for actual and statutory damages under 15 USC §1640.

66.     TILA rescission does not only cancel a security interest in the property but it also cancels any liability to pay finance and other charges, including accrued interest, points, broker fees, closing costs and provides that the creditor and/or assignee must refund all fees paid.

67.     Plaintiff's extended right to rescind on the first deed of trust was in effect on February 3, 2009 when Plaintiff validly rescinded the transaction by sending to AHMS, DEUTSCHE and LENDER DOE's agent, the notification of the wish for rescission as alleged herein  (Exhibit B).

68.     Said notice was sent to the servicing agent of LENDER DOE, AHMS, who is authorized to receive notices on behalf of LENDER DOE under State agency laws and pursuant to the Truth In Lending Act.

69.     In an attempt to mitigate the damages, Plaintiff offered alternatives in its rescission request by agreeing to settle the issue in multiple manners such as a modification and even left open the door to counterproposals from Defendant.

    a.   Plaintiff did so on the belief of the general principal that "victims of legal wrong should make reasonable efforts to avoid incurring further damage."

    b.   Furthermore, since every contract has an element of "good faith and fair dealing" said attempts were to act in good faith in attempting to resolve the rescission issue.

    c.   The Truth In Lending Act does not prohibit a consumers attempt to mitigate damages as part of their rescission request.

70.     Defendant did not act upon Plaintiffs attempt to mitigate damages or act in good faith towards a resolution.

71.     The model form of a rescission notice (H-8) under Appendix H to Regulation Z begins the exercise of the rescission by the statement "I WISH TO CANCEL".

    a.   Black's Law Dictionary defines "wish" as "eager desire; longing; expression of desire; a thing desired; an object of desire."  Desire is further defined as "to ask, to request."

72.     In effect, a consumer merely must notify the creditor of the desire to cancel for notice to be effective and is not required by said notice to contain proof of tender or a definitive statement of rescission.

73.     A true and correct copy of the Notices of Right to Cancel which failed to comply with the Truth In Lending Act are attached as Exhibit C.  Prior to filing the complaint, these are the only copies of the Notice of Right to Cancel ever provided to Plaintiff.

74.     AHMS, DEUTSCHE and LENDER DOE's failure to rescind the loan and take the action necessary and appropriate to reflect the termination of the security interest within 20 days after Plaintiff's rescission of the transaction violated the Truth In Lending Act separate and apart from the origination of the loan.

75.     AHMS, DEUTSCHE and LENDER DOE have not requested from a court of competent jurisdiction to modify the rescission process pursuant to Regulation Z 226.23(d)(4) during or after the 20 day response period thereby rendering the security interest (deed of trust) void leaving any tender obligation of Plaintiff, if any, as an unsecured obligation which was subsequently discharged in the Chapter 7 bankruptcy on July 31, 2009, of which Defendants were named as a creditor.

   a.   Since 15 U.S.C. §1635 is a statute of repose, Plaintiff contends that Defendants are now unable to request from any court of competition to modify the process under Regulation Z 226.23(d)(4) as such a request is now time barred.

76.     Plaintiff contends that tender was not a required event in the present rescission process as Defendants were obligated to act within the 20 day period pursuant to Regulation Z 226.23(d)(3), willfully failed to do so, failed to seek modification from a court of competent jurisdiction to maintain their security during the rescission process and allowed a discharge, by their own negligence, of the unsecured obligation in a Chapter 7 bankruptcy.

77.     Pursuant to 15 U.S.C. § 1640, Plaintiff has one year from the refusal by AHMS, DEUTSCHE AND LENDER DOE (or their agent) to file suit for damages, attorney's fees and costs and by this complaint, has done so.

78.     Plaintiff properly exercised their right by sending the notification of their wish to rescind the loan within the 3 year statute of limitations for said remedy, Plaintiff hereby requests damages, costs and attorney fees pursuant to both 15 U.S.C. §1635 and 15 U.S.C. §1640.

79.     The statute and regulation specify that the security interest, promissory note or lien arising by operation of law on the property becomes automatically void. (15 U.S.C. § 1635(b); Reg. Z §§ 226.15(d)(1), 226.23(d)(1).

80.     As noted by the Official Staff Commentary, the creditor's interest in the property is "automatically negated regardless of its status and whether or not it was recorded or perfected." (Official Staff Commentary §§ 226.15(d)(1)-1, 226.23(d)(1)-1.).

81.     The security interest is void and of no legal effect irrespective of whether the creditor makes any affirmative response to the notice. Also, strict construction of Regulation Z would dictate that the voiding be considered absolute.

82.     Non-compliance with the rescission request is a violation of the act which gives rise to a claim for actual and statutory damages under 15 USC §1640.

83.     TILA rescission does not only cancel a security interest in the property but it also cancels any liability to pay finance and other charges, including accrued interest, points, broker fees, closing costs and provides that the creditor and/or assignee must refund all fees paid.

84.     Plaintiff requests damages from DEUTSCHE  and LENDER DOE in the form of a court order rendering the security instrument of DEUTSCHE  and LENDER DOE void and ownership of the property (money lent to Plaintiff) vests to the Plaintiff without obligation on their part to pay for it.

     a.     In the alternative, Plaintiff requests that the obligation to tender any funds were an unsecured obligation of the Plaintiff and said obligation was discharged in their Chapter 7 bankruptcy.

85.     Plaintiff requests damages from DEUTSCHE  and LENDER DOE in any other alternative relief the court deems fit and proper to effectuate the self executing process of 15 U.S.C. §1635.

86.     Plaintiff requests damages from AHMS, DEUTSCHE and LENDER DOE in the form of the all costs and attorney fees incurred related to this action as allowed by 15 U.S.C. §1640.

87.     Plaintiff requests statutory damages from AHMS, DEUTSCHE and LENDER DOE of $2,000.00 for failing to rescind the loan as required by TILA.

88.     Plaintiff requires damages from AHMS, DEUTSCHE and LENDER DOE for the return of all fees, interest and finance charges related to the LENDER DOE loan.

89.     Plaintiff requests the court grant Declaratory Relief perfecting that Plaintiff timely rescinded their loan within the statutory 3 year period pursuant to 15 U.S.C. §1635.

90.     Plaintiff requests the court grant injunctive relief against AHMS, DEUTSCHE and LENDER DOE preventing enforcement of the security interest of the subject loan until final disposition of this action.

91.     Plaintiff requests that the court order AHMS to comply with Plaintiff's request for the name, address and telephone number of the true note holder as requested in the Plaintiff's February 3, 2009 (Exhibit B) letter pursuant to 15 U.S.C. § 1641.

**SECOND CAUSE OF ACTION FOR REAL ESTATE SETTLEMENT PROCEDURES ACT VIOLATIONS AGAINST ALL DEFENDANTS**
**(Violations of Real Estate Settlement Procedures Act,**
**12 U.S.C. § 2601 et seq. – Failing to Properly Respond to a QWR)**

92.     Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

93.     AHMS is the agent of the owner of the obligation of DEUTSCHE  and LENDER DOE.

94.     Violation of RESPA applies to servicing agents related to their servicing activities.

95.     DEUTSCHE  and LENDER DOE, as the principal to their agency with AHMS is liable for the acts of their agent under agency law and as such, Plaintiff contends that DEUTSCHE, LENDER DOE and AHMS are jointly and severally liable for damages stated herein.

96.     The Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 et seq. ("RESPA") was enacted on December 22, 1974.

97.     RESPA applies to "federally related mortgage loans," which is defined at 12 U.S.C. § 2602(1).  RESPA initially applied only to certain first liens on residential real property.  On October 28, 1992, the law was amended to cover subordinate liens and loans used to prepay or pay off an existing loan secured by the same property.  12 U.S.C. § 2602(1); 24 C.F.R. § 3500.2.

98.     Plaintiff's February 3, 2009 letter (Exhibit B) was sent via a Certificate of Mailing with the United States Post Office (Exhibit D).

99.     AHMS did not respond to the requests of Plaintiff.

100.    Plaintiff's request is consistent with a Qualified Written Request under 12 U.S.C. § 2605(e),

which imposes upon "loan servicers" the duty to timely respond to a "qualified written request" from a borrower.

101.   A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that –

    a.   includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

    b.   includes a statement of the reasons for <u>the belief of the borrower</u>, not the belief of the servicer, to the extent applicable, that the account is in error **<u>or provides sufficient detail to the servicer regarding other information sought by the borrower</u>**.

102.   AHMS failed to acknowledge Plaintiff's Qualified Written Request pursuant to RESPA within 20 business days of receipt.  12 U.S.C. 2605(e)(1)(A).

103.   Plaintiff's February 3, 2009 letter (Exhibit B) was sent via a Certificate of Mailing with the United States Post Office (Exhibit D).  Allowing for mailing of 5 days, they were required to acknowledge the QWR by March 3, 2009.

104.   To date, AHMS has failed to respond to Plaintiff's Qualified Written Request pursuant to RESPA within 60 business days of receipt (12 U.S.C. 2605(e)(1)(A)) from their February 3, 2009 letter which was sent via a Certificate of Mailing with the United States Post Office (Exhibit D). Allowing for mailing of 5 days, they are required to respond to the QWR by April 28, 2009.

105.   12 U.S.C. §2605(e)(2) requires a loan servicer to take certain action within 60 days of receipt of a qualified written request. Such action may include:

    a.   providing the borrower with a written explanation or clarification that includes . . .

        i.   information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and

        ii.   the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower. 12 U.S.C.

§ 2605(e)(2).

106.   The request contained reasonable requests for copies of the closing documents that were signed as the only copies ever received did not contain completed copies and Plaintiff is entitled to completed copies.

    a.   Said request was consistent with the blank Notice of Right to Cancel contained in their request.

107.   The request contained a request for the true owner of the obligation as Plaintiff is entitled to know who their contract is with under common law.

108.   Furthermore, Plaintiff requested a copy of the servicing contract under the QWR under RESPA because Plaintiff contends that AHMS, as a servicing agent, is acting in a manner that is motivated by their own financial interests in that their servicing compensation is higher when then foreclose on a property as opposed to addressing the claims of Plaintiff and attempting to resolve a dispute that would be beneficial to the owner of the obligation and the Plaintiff and would be consistent to act in a manner of good faith and fair dealing that is inherent in the contract they are collecting for.

    a.   As an agent of the their principal, they are conferred with the same rights as their principal under agency law and therefore must also act in good faith and fair dealing and in failing to do so, Plaintiff contains renders their principals liable for any act that is deemed lacking in good faith and fair dealing in the enforcement of the contract.

    b.   The actual servicing agreement, which will show the actual compensation variance between servicing fees on loans in foreclosure and those that are current and resolved, was requested as part of the Plaintiffs request under their Qualified Written Request but said request was ignored.

109.   Defendant's failure is willful and they have had several complaints related to their intentional ignoring of Qualified Written Requests under RESPA and Defendants do not have in place

reasonable and proper controls to proper to respond to said requests.

110.   Pursuant to 12 U.S.C. 2605 (f), Plaintiffs are entitled from AHMS, DEUTSCHE and LENDER DOE, actual damages, statutory penalty of $1,000.00 and attorney fees and costs.

### THIRD CAUSE OF ACTION FOR FAIR DEBT COLLECTION PRACTICES ACT VIOLATIONS AGAINST DEFENDANT
**Rosenthal Fair Debt Collection Practices Act**
**California Civil Code §§ 1788-1788.32)**

111.   Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

112.   AHMS is the agent of the owner of the obligation of DEUTSCHE and or LENDER DOE.

113.   Defendant AHMS is a debt collector under the RFDCPA as they are currently servicing the loan on behalf of an unknown investor or on behalf of themselves.

    a.   For purposes of status, Plaintiff believes that AHMS is a servicing agent therefore debt collector however their true status is vague and unknown as AHMS has not informed Plaintiff of their true status despite requesting under a Qualified Written Request under RESPA who actually owns the obligation.

114.   The Rosenthal Fair Debt Collection Practices Act in § 1788.17 requires that all debt collectors, as defined under § 1788.2(c), which includes a creditor or anyone else collecting a debt on behalf of others, must comply with the provisions of 15 U.S.C. §1692b -§1692j and subject to the remedies of 15 U.S.C. § 1692k.

115.   Defendant AHMS received the Plaintiffs letter dated February 3, 2009 (Exhibit "B" and incorporated herein by reference). Plaintiff's letter stated, in part:

> *"In addition, Mr. and Mrs. Sam are asserting their rights under Section 805 of the Federal Fair Debt Collections Practices Act and the California Rosenthal's Fair Debt Collection Practices Act (applying to all creditors the Federal statute) in that they wish that all communications cease in relation to the debt except in the form of a written response to the request contained in this letter or those allowed per the statute."*

116.   Despite said notification, Defendant AHMS repeatedly contacted Plaintiff with phone calls

and written letters attempting to collect the debt.  These contacts were outside the scope of those associated with a non-judicial foreclosure nor were they authorized by any other statute.

117.   Such violation is a willful disregard for the rights of the Plaintiff and pursuant to California Civil Code § 1788.30 Plaintiff is entitled to actual damages, statutory penalty of no less than $100.00 and no more than $1,000.00 and actual attorney fees.

118.   Plaintiff contends that AHMS does not have in place reasonable procedures necessary to avoid such a violation and their acts were therefore willful and they should not be allowed to avoid said damages and awards by claiming their acts were merely a bona fide error.

### FOURTH CAUSE OF ACTION FOR UNFAIR BUSINESS PRACTICES AGAINST ALL DEFENDANTS
**(Violation of California's Unfair Competition Law,**
**Bus. & Prof. Code §17200 et seq.)**

119.   Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

120.   The Court has jurisdiction over this action pursuant to Business and Professions Code §§ 17200 et seq., specifically Business and Professions Code § 17203, which provides any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction; and the court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition; and Business and Professions Code Section 17204, which provides for actions for any relief pursuant to the Unfair Competition Law to be prosecuted exclusively in a court of competent jurisdiction by any board, officer, person, corporation or association or by any person acting for the interests of itself, its members or the general public.

121.   At all times relevant to this Complaint, AHMS was acting as a loan servicer, and DEUTSCHE  and LENDER DOE were acting as the owner of the obligation, who is in the business

of providing and servicing residential mortgages to the general public and was acting within the scope of that business with regard to the loan transactions provided to Plaintiff.

    a.  For purposes of status, Plaintiff believes that AHMS is a servicing agent however their true status is vague and unknown as AHMS has not informed Plaintiff of their true status despite requesting under a Qualified Written Request under RESPA who actually owns the obligation.

122.  AHMS is the agent of the owner of the obligation of DEUTSCHE and or LENDER DOE.

123.  DEUTSCHE and LENDER DOE, as the principal to their agency with AHMS, is liable for the acts of their agent under agency law and as such, Plaintiff contends that all Defendants are jointly and severally liable for damages stated herein.

124.  As set forth above under the all causes of action herein, Defendants violated TILA, RESPA and other statutory and common laws stated herein.

125.  Since Plaintiff rescinded their loan in February 3, 2009, AHMS has continually engaged in harassment of the Plaintiff, communicated regarding the debt, invaded the privacy of Plaintiff and reported negative credit of Plaintiff, all the while never responding to Plaintiffs request for rescission and Qualified Written Request.

126.  As such, Defendants have an obligation to comply with the various statutes of TILA, RESPA, Fair Debt Collection and have ignored their compliance.  In the most outrageous of conduct, they ignored the requests but instead responded to the Plaintiff by filing a Notice of Default (foreclosure) on the property.

    a.  Plaintiff was damaged by such activity as they were required to file a bankruptcy to protect their interest in the property which thereby impacted their credit further and further impairs Plaintiff's ability to tender.  Had Defendants acted on the requests the filing of bankruptcy could have been avoided.

127.  Even though Plaintiff had rescinded the loan of Defendant and Defendant's security interest

was rendered void, Defendant moved to enforce the security instrument by a foreclosure process without seeking judicial guidance as to the validity of their security interest.

128.   Furthermore, Plaintiff contends that AHMS, as a servicing agent, is acting in a manner that is motivated by their own financial interests in that their servicing compensation is higher when then foreclose on a property as opposed to addressing the claims of Plaintiff and attempting to resolve a dispute that would be beneficial to the owner of the obligation and the Plaintiff and would be consistent to act in a manner of good faith and fair dealing that is inherent in the contract they are collecting for.

   a.   As an agent of the their principal, they are conferred with the same rights as their principal under agency law and therefore must also act in good faith and fair dealing and in failing to do so, Plaintiff contains renders their principals liable for any act that is deemed lacking in good faith and fair dealing in the enforcement of the contract.

   b.   To support the Plaintiff's contention that AHMS is motivated to act in their own financial interests, Plaintiff incorporates by reference (Exhibit F), National Consumer Law Center's report titled "Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior."

   c.   The actual servicing agreement, which will show the actual compensation variance between servicing fees on loans in foreclosure and those that are current and resolved, was requested as part of the Plaintiffs request under their Qualified Written Request but said request was ignored.

129.   Said conduct unfairly harms consumers in California as AHMS ignored their obligation to take action pursuant to the TILA and RESPA requests of consumers and instead "bullied" the consumer by filing foreclosure and profited from their action.  In effect, "laughing all the way to the bank."

130.   Defendants DEUTSCHE and LENDER DOE, do not have proper control and oversight of

AHMS to ensure they act in a manner in the collection of their contract consistent with their obligation to act in good faith and fair dealing.  That lack of control and oversight results in an unfair business practice against Plaintiff and similar California residents.

131.   WHEREFORE, Plaintiff prays for judgment for rescission, damages, attorney fees and any other relief the court deems fit and proper.

## FIFTH CAUSE OF ACTION AGAINST
## ALL DEFENDANTS
### (Slander [Libel] of Credit)

132.   Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

133.   At all times relevant to this Complaint, AHMS was acting as a loan servicer and DEUTSCHE and LENDER DOE were acting as the owner of the obligation, who are in the business of providing and servicing residential mortgages to the general public and was acting within the scope of that business with regard to the loan transactions provided to Plaintiff.

134.   DEUTSCHE and LENDER DOE, as the principal to their agency with AHMS, are liable for the acts of their agent under agency law and as such, Plaintiff contends that all defendants are jointly and severally liable for damages stated herein.

135.   Plaintiff contends that AHMS caused to be published with various credit reporting agencies false statements regarding the Plaintiff's creditworthiness without informing that such claims were disputed.

136.   Plaintiff contends that AHMS caused to be published, when not allowed per law (RESPA as a Qualified Written Request was pending) negative credit information regarding the Plaintiff's creditworthiness.

137.    The Plaintiff alleges that the actions and inactions of the Defendants have impaired their credit history causing them to lose the ability to have good credit and impacting their ability to tender, entitling them to damages, including statutory damages pursuant to state and federal law, all

to be proved at the time of trial.

### SIXTH CAUSE OF ACTION AGAINST DEUTSCHE and LENDER DOE
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

138.   Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

139.   DEUTSCHE and LENDER DOE entered into or purchased written agreements with Plaintiff based upon the term on the loans as stated in the Note (contained in Exhibit A).

140.   DEUTSCHE and LENDER DOE has an obligation to act in good faith and fair dealing as provided for in Section 205 of the Restatement Second of Contracts.  Said restatement states:

> *"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."*

141.   Plaintiff contends that DEUTSCHE and LENDER DOE and Plaintiff have an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.

142.   Plaintiff contends that the covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith.

143.   Plaintiff contends that the covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from <u>unfairly frustrating</u> the other party's right to receive the benefits of the agreement actually made.

   a.   Supporting this position is the fact that DEUTSCHE and LENDER DOE's servicer, AHMS, did not even respond to Plaintiff's requests but instead filed foreclosure because they receive higher compensation by foreclosing.  This completely and unfairly has frustrated Plaintiff's ability to get any resolution absent filing bankruptcy and this lawsuit, which is extremely unfair.

144.   The Notice of Right to Cancel was prepared and created by Defendants predecessor, and

applicable to Plaintiff's loan, did not disclose, and by omission, failed to inform Plaintiff what the rescission period was in violation of TILA as alleged herein.

145. Despite calling to the attention of the Defendants the rescission problems, the Plaintiff offered to resolve the issue by negotiation, Defendant did not engage in the slightest effort of good faith to resolve the issue with Plaintiff.

146. Defendants unfairly interfered with Plaintiff's rights to receive the benefits of the contract.

147. Plaintiff, on the other hand, did all of those things the contract required of them under the terms of the loan transactions including exercising their rights under the Truth In Lending Act.

148. At all times relevant, Defendants unreasonably denied Plaintiff the benefits promised to them under the terms of the Note, including providing a proper Notice of Right to Cancel.

149. Plaintiff contacted Defendants on February 3, 2009 pointing out defects in their contract, proposed a solution and made the requests under statutory authority.  Defendants did not comply with the statutory requests or engage in any good faith effort to resolve the issue.  Instead, they sent threatening letters demanding payments on a rescinded loan and if said payments were not made, they would foreclose on the property and did in fact file for foreclosure.

150. Knowing the truth and motivated by profit and market share, Defendants have knowingly and willfully breached the implied covenant of good faith and fair dealing by engaging in the acts and/or fraudulent omissions to mislead and/or deceive Plaintiff and others similarly situated as alleged herein.

151. Defendants' breaches, as alleged herein, were committed with willful and wanton disregard for whether or not Plaintiff or others similarly situated could exercise their consumer rights (TILA, RESPA and Fair Debt Collection) and merely ignored their requests, which is not reasonable.

152. Defendants' placing of their corporate and/or individual profits over the rights of others is particularly vile, base, contemptible, and wretched and said acts and/or omissions were performed on the part of officers, directors, and/or managing agents of each corporate defendant and/or taken

with the advance knowledge of the officers, directors, and/or managing agents who authorized and/or ratified said acts and/or omissions. Defendants thereby acted with malice and complete indifference to and/or conscious disregard for the rights and safety of others, including Plaintiff and the General Public.

153.   At all times relevant, Defendants' conduct, as alleged herein, was malicious, oppressive, and/or fraudulent.

154.   As a result of Defendants' conduct, Plaintiff has suffered harm as proven hereto before and to be proven at trial.

155.   WHEREFORE, Plaintiff is entitled to declaratory relief, all damages proximately caused by Defendants' breach of the implied covenant of good faith and fair dealing as alleged herein, punitive damages, pre-judgment interest, costs of suit and other relief as the Court deems just and proper.

**SEVENTH CAUSE OF ACTION AGAINST
ALL DEFENDANTS
(Slander [Libel] of Title)**

156.   Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

157.   Defendants have caused to be recorded various documents including a Notice of Default which has impaired the Plaintiffs title which constitutes slander of title and the Plaintiff should be awarded resulting damages to be fully proved at the time of trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against each Defendant, jointly and severally, as follows:

A. For actual damages according to proof;

B. For compensatory damages as permitted by law;

C. For consequential damages as permitted by law;

D. For statutory damages as permitted by law;

E. For rescission;

F. For equitable relief, including restitution;

G. For restitutionary disgorgement of all profits Defendant obtained as a result of their unfair

competition;

H. For interest as permitted by law;

I. For Declaratory Relief;

J. For Injunctive Relief;

K. For reasonable attorneys' fees and costs; and

L. For such other relief as is just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Pursuant to the Federal Rules of Civil Procedure Rule 38, Plaintiff Jerry Sam and Melenie Sam

hereby demands a jury trial on all issues triable by jury.


Dated:  October 22, 2009            By:_/s/ Kimberlee A. Rode_____
                                    Kimberlee A. Rode, Attorney for
                                    Jerry Sam and Melenie Sam

**Exhibit List**

| Exhibit A | Copy of Note and Deed of Trust on First Deed of Trust |
| Exhibit B | Rescission Letter dated 03/10/2009 |
| Exhibit C | Copies of Notice of Right to Cancel received by Plaintiffs. |
| Exhibit D | Certificate of Mailing |
| Exhibit E | Bankruptcy Discharge filed July 31, 2009 |
| Exhibit F | National Consumer Law Center report titled "Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior." |

Complaint Exhibit "A"

# ADJUSTABLE RATE NOTE
## (LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

9535  PALAZZO DR,  STOCKTON, CA 95212-3519

[Property Address]

1.   **BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S.   $488,000.00      (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is

PROFFER FINANCIAL A CALIFORNIA CORPORATION, A CALIFORNIA CORPORATION       .

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

2.   **INTEREST**

Interest will be charged on unpaid principal until the full amount of principal has been paid.  Interest will be calculated on the basis of a 12-month year and a 30-day month. I will pay interest at a yearly rate of    7.280%    . The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

3.   **PAYMENTS  \*\*\* INTEREST ONLY NOTE ADDENDUM ATTACHED HERETO AND MADE PART HEREOF\*\*\***

(A) Time and Place of Payments

I will pay principal and interest by making payments every month.

I will make my monthly payments on the first day of each month beginning on  May 01      ,  2006

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on,

April 01      ,  2036      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at     PROFFER FINANCIAL A CALIFORNIA CORPORATION
3636 NOBEL DR., SUITE #410, SAN DIEGO, CA  92122
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S.   $2,960.53      . This amount may change.

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

(D) Application of Payments

Payments received by the Note Holder will be applied in the following order: (i) prepayment charges due under this Note; (ii) amounts payable under paragraph 2 of the Security Instrument (defined below); (iii) interest due under this Note; (iv) principal due under this Note; and (v) late charges due under this Note.

4.   **INTEREST RATE AND MONTHLY PAYMENT CHANGES  \*\*\*INTEREST ONLY NOTE ADDENDUM**
     **ATTACHED HERETO AND MADE PART HEREOF\*\*\***

(A) Change Dates

The interest rate I will pay may change on the first day of   April 01      ,  2011      , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding

SIX AND 10/100                               percentage point(s) ( 6.100%       )

to the Current Index. The Note Holder will then round the result of this addition to the next higher one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than    10.280%    or less than    7.280%    . Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1.0%) from the rate of interest I have been paying for the preceding six months. In no event will my interest rate be greater than    13.280%    or less than    7.280%    .

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

5.    **BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of principal at any time before they are due, together with accrued interest. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

If within    36 Months    from the date of execution of the Security Instrument I make a full prepayment or, in certain cases a partial prepayment, I will at the same time pay to the Note Holder a prepayment charge. The prepayment charge will be equal to six (6) months advance interest on the amount of any prepayment that, when added to all other amounts prepaid during the twelve (12) month period immediately preceding the date of the prepayment, exceeds twenty percent (20%) of the original principal amount of this Note. In no event will such a charge be made unless it is authorized by state or federal law.

6.    **LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

7.    **BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of    15    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    6.000%    of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default. If I am in default, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all interest that I owe on that amount, together with any other charges that I owe under this Note or the Security Instrument, except as otherwise required by applicable law.

**(C) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(D) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law, whether or not a lawsuit is filed. Those expenses include, for example, reasonable attorneys' fees.

8.    **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9.    **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

USNT6022.wp (02-01-02)

**10.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.    SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.


WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.


_____ (Seal)          _____ (Seal)
JERRY   SAM                      -Borrower        MELENIE   SAM                    -Borrower


_____ (Seal)          _____ (Seal)
                                 -Borrower                                         -Borrower


_____ (Seal)          _____ (Seal)
                                 -Borrower                                         -Borrower


                                                              [Sign Original Only]

# ADDENDUM TO NOTE
## FOR THE INTEREST ONLY PAYMENT PERIOD

**THIS ADDENDUM TO NOTE PROVIDES FOR AN INITIAL PERIOD OF MONTHLY PAYMENTS OF INTEREST ONLY AND FOR SUBSEQUENT MONTHLY PAYMENTS OF BOTH PRINCIPAL AND INTEREST.**

THIS ADDENDUM TO NOTE FOR THE INTEREST ONLY PAYMENT PERIOD is made this   06   day of March       , 2006  and is incorporated into and shall be deemed to amend and supplement the Adjustable Rate Note of the same date (the "Note") and any Addenda to the Note given by the undersigned (the "Borrower") to evidence Borrower's indebtedness to   PROFFER FINANCIAL A CALIFORNIA CORPORATION, A CALIFORNIA CORPORATION (the "Lender"), which indebtedness is secured by a Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date and covering the property described in the Security Instrument and located at:

> 9535  PALAZZO DR,  STOCKTON, CA 95212-3519

ADDITIONAL COVENANTS: Unless specifically defined in this Addendum, any capitalized terms shall have the same meaning as in the Note.  Notwithstanding anything to the contrary set forth in the Note, Addenda to the Note or Security Instrument, Borrower and Lender further covenant and agree as follows:

I.  Section 3 of the Note is modified to provide for sixty (60) monthly payments of interest only ("Interest Only Period") at the interest rates determined in accordance with Sections 2 and 4 of the Note.  Section 3 of the Note is modified as follows:

### 3.  PAYMENTS
#### (A) Time and Place of Payments
I will pay interest during the Interest Only Period, and principal and interest thereafter during the Amortization Period, by making a payment every month.

**Interest Only Period** - The "Interest Only Period" is the period from the date of this Note through the 60th Monthly Payment

**Amortization Period** - The "Amortization Period" is the period after the Interest Only Period and continuing until the Maturity Date.

I will make my monthly payments on the first day of each month beginning on   May 01, 2006                .   I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.  Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal.  If, on        April 01, 2036                     I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make monthly payments at   PROFFER FINANCIAL A CALIFORNIA CORPORATION
                3636 NOBEL DR., SUITE #410, SAN DIEGO, CA  92122
or at a different place if required by the Note Holder.

#### (B) Amount of My Interest Only Payments
The first sixty (60) monthly payments will be in the full amount of U.S. $ 2,960.53                    , which equals one twelfth (1/12th) of the amount of yearly interest due on the principal at the time the loan was made.  These payments are called the "Interest Only Payments."

*Interest Only Payment Period Addendum - 5/25 ARM*
Page 1 of 2

USD5611.wp (03-24-05)

No payments of principal are due during the Interest Only Period.  The Interest Only Payments will not reduce the principal amount of this Note.  Additional payments of principal may be made in accordance with Section 5 of this Note.

**(C) Monthly Payment Changes**
During the Amortization Period, I will begin making principal and interest payments.
Beginning with the 61st payment, changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay.  The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**II.** All other provisions of the Note and any Addenda are unchanged by this Addendum to Note for Interest Only Payments and remain in full force and effect.

**I understand that for the Interest Only Period I will not be reducing the principal balance.  After 5 years if I only made my minimum payment, my principal balance will not be reduced.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and conditions contained in the Interest Only Payment Period Addendum.

| | |
|---|---|
| _____ (Seal) | _____ (Seal) |
| JERRY   SAM                -Borrower | -Borrower |
| | |
| _____ (Seal) | _____ (Seal) |
| MELENIE   SAM            -Borrower | -Borrower |
| | |
| _____ (Seal) | _____ (Seal) |
| -Borrower | -Borrower |

*Interest Only Payment Period Addendum - 5/25 ARM*
Page 2 of 2

USD5611.wp (03-24-05)

PREPARED BY AND
WHEN RECORDED MAIL TO:
PROFFER FINANCIAL A CALIFORNIA CORPORATION
3636 NOBEL DR., SUITE #410
SAN DIEGO, CA  92122

Loan Number:  631012337
Servicing Number:  002101479-0

_____ [Space Above This Line For Recording Data] _____

## DEED OF TRUST

THIS DEED OF TRUST ("Security Instrument") is made on      March 06, 2006
The trustor is
JERRY SAM  AND MELENIE SAM, HUSBAND AND WIFE AS JOINT TENANTS

("Borrower").

The trustee is        PROFFER FINANCIAL A CALIFORNIA CORPORATION

("Trustee").

The beneficiary is PROFFER FINANCIAL A CALIFORNIA CORPORATION, A CALIFORNIA CORPORATION
,
which is organized and existing under the laws of   CALIFORNIA
,
and whose address is     3636 NOBEL DR., SUITE #410, SAN DIEGO, CA  92122

("Lender").

Borrower owes Lender the principal sum of
 FOUR HUNDRED EIGHTY EIGHT THOUSAND  DOLLARS NO CENTS
                          . . .AND NO/100THs     Dollars (U.S.  $488,000.00        ).
This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly
payments, with the full debt, if not paid earlier, due and payable on      April 01, 2036
This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals,
extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect
the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security
Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the
following described property located in                     San Joaquin                         County, California:
 124-160-73

LOT 110, IN THE CITY OF STOCKTON, COUNTY OF SAN JOAQUIN, STATE OF CALIFORNIA, AS
SHOWN ON THAT CERTAIN MAP ENTITLED LA MORADA UNIT NO. 12, FILED FOR RECORD OCTOBER
31, 2002, IN BOOK 37, OF MAPS AND PLATS AT PAGE 72, OFFICIAL RECORDS OF SAN JOAQUIN
COUNTY.

EXCEPT THEREFROM ALL OIL, GAS, MINERALS, AND OTHER HYDROCARBON SUBSTANCES LYING
BELOW A DEPTH OF 500 FEET, BUT WITH NO RIGHT OF SURFACE ENTRY, AS PROVIDED IN DEEDS
OF RECORD.

which has the address of          9535  PALAZZO DR, STOCKTON

California            95212-3519          ("Property Address");                      (Street, City)
                      (Zip Code)

**CALIFORNIA - Single Family**
Page 1 of 8

CAD10011 (10-07-98)

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property".

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

**2. Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a Lender for a federal related mortgage loan may require for Borrower's escrow account under the Federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. @ 2601 *est seq.* ("RESPA"), unless another law that applies to the Funds sets a lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits or accounts of which are insured or guaranteed by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not Charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; last, to any late charges due under the Note.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this

Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5. Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, any insurance proceeds shall be applied first to reimburse Lender for costs and expenses incurred in connection with obtaining any such insurance proceeds, and then, at Lender's option, in such order and proportion as Lender may determine in its sole and absolute discretion, and regardless of any impairment of security or lack thereof: (i) to the sums secured by this Security Instrument, whether or not then due, and to such components thereof as Lender may determine in its sole and absolute discretion; and/or (ii) to Borrower to pay the costs and expenses of necessary repairs or restoration of the Property to a condition satisfactory to Lender. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, Lender may collect the insurance proceeds. Lender may, in its sole and absolute discretion, and regardless of any impairment of security or lack thereof, use the proceeds to repair or restore the Property or to pay the sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

If Borrower obtains earthquake insurance, any other hazard insurance, or any other insurance on the Property and such insurance is not specifically required by Lender, then such insurance shall (i) name Lender as loss payee thereunder, and (ii) be subject to the provisions of this paragraph 5.

**6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower acknowledges that the Lender does not desire to make a loan to Borrower secured by this property on the terms contained in the Note unless the property is to be occupied by Borrower as Borrower's primary/secondary residence. Lender makes non-owner residence loans of different terms. Borrower promises and assures Lender that Borrower intends to occupy this property as Borrower's primary/secondary residence and that Borrower will so occupy this property as its sole primary/secondary residence within sixty (60) days after the date of the Security Instrument. If Borrower breaches this promise to occupy the property as Borrower's primary/secondary residence, then Lender may invoke any of the following remedies, in addition to the remedies provided in the Security Instrument; (1) Declare all sums secured by the Security Instrument due and payable and foreclose the Security Instrument, (2) Decrease the term of the loan and adjust the monthly payments under the Note accordingly, increase the interest rate and adjust the monthly payments under the Note accordingly, or (3) require that the principal balance be reduced to a percentage of either the original purchase price or the appraised value then being offered on non-owner occupied loans.

Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

Borrower shall, at Borrower's own expense, appear in and defend any action or proceeding purporting to affect the Property or any portion thereof or Borrower's title thereto, the validity or priority of the lien created by this Security Instrument, or the rights

CAD10013 (10-07-98)

or powers of Lender or trustee with respect to this Security Instrument or the Property. All causes of action of Borrower, whether accrued before or after the date of this Security Instrument, for damage or injury to the Property or any part thereof, or in connection with any transaction financed in whole or in part by the proceeds of the Note or any other note secured by this Security Instrument, by Lender, or in connection with or affecting the Property or any part thereof, including causes of action arising in tort or contract and causes of action for fraud or concealment of a material fact, are, at Lender's option, assigned to Lender, and the proceeds thereof shall be paid directly to Lender who, after deducting therefrom all its expenses, including reasonable attorneys' fees, may apply such proceeds to the sums secured by this Security Instrument or to any deficiency under this Security Instrument or may release any monies so received by it or any part thereof, as Lender may elect. Lender may, at its option, appear in and prosecute in its own name any action or proceeding to enforce any such cause of action and may make any compromise or settlement thereof. Borrower agrees to execute such further assignments and any other instruments as from time to time may be necessary to effectuate the foregoing provisions and as Lender shall request.

   **7. Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

   Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate in effect from time to time and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

   **8. Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

   **9. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

   **10. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Lender may apply, use or release the condemnation proceeds in the same manner as provided in paragraph 5 hereof with respect to insurance proceeds.

   If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

   Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

   **11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

   **12. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this

Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**14. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located.  In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

**19. Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law. The holder of the Note and this Security Instrument shall be deemed to be the Lender hereunder.

**20. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and

CAD10015 (10-07-98)

to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or remediation of any Hazardous Substances affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

Borrower shall be solely responsible for, shall indemnify, defend and hold harmless Lender, its directors, officers, employees, attorneys, agents, and their respective successors and assigns, from and against any and all claims, demands, causes of action, loss, damage, cost (including actual attorneys' fees and court costs and costs of any required or necessary repair, cleanup or detoxification of the Property and the preparation and implementation of any closure, abatement, containment, remedial or other required plan), expenses and liability directly or indirectly arising out of or attributable to (a) the use, generation, storage, release, threatened release, discharge, disposal, abatement or presence of Hazardous Substances on, under or about the Property, (b) the transport to or from the Property of any Hazardous Substances, (c) the violation of any Hazardous Substances law, and (d) any Hazardous Substances claims.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, or other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

ADDITIONAL COVENANTS. Borrower and Lender further covenant and agree as follows:

21. **Acceleration; Remedies.** If any monthly installment under the Note or notes secured hereby is not paid when due, or if Borrower should be in default under any provision of this Security Instrument, or if Borrower is in default under any other deed of trust or other instrument secured by the Property, all sums secured by this Security Instrument and accrued interest thereon shall at once become due and payable at the option of Lender without prior notice and regardless of any prior forbearance. In such event, Lender, at its option, may then or thereafter deliver to Trustee a written declaration of default and demand for sale and shall cause to be filed of record a written notice of default and of election to cause to be sold the Property. Lender shall also deposit with Trustee this Security Instrument and any notes and all documents evidencing expenditures secured hereby.

After the lapse of such time as then may be required by law following recordation of such notice of default, and notice of sale having been given as then required by law, Trustee, without demand on Borrower, shall sell the Property at the time and place specified by Trustee in such notice of sale, or at the time to which such noticed sale has been duly postponed, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale, except that Lender may offset its bid to the extent of the total amount owing to it under the Note and this Security Instrument, including Trustee's fees and expenses. Trustee may sell the Property as a whole or in separate parcels if there is more than one parcel, subject to such rights as Borrower may have by law to direct the manner or order of sale, or by such other manner of sale which is authorized by law. Trustee may postpone the time of sale of all or any portion of the Property by public declaration made by Trustee at the time and place last appointed for sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

22. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall release this property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for releasing the Property for services rendered if the charging of the fee is permitted under applicable law.

23. **Substitute Trustee.** Lender may, from time to time, by instrument in writing, substitute a successor or successors to any Trustee named in this Security Instrument or acting hereunder. Such instrument shall be executed and acknowledged by Lender and recorded in the office of the Recorder of the county or counties where the property is situated and shall be conclusive proof of the proper substitution of such successor Trustee or Trustees. Such successor Trustee or Trustees shall, without conveyance from the predecessor Trustee, succeed to all its title, estate, rights, powers and duties. The procedure herein provided for substitution of Trustees shall not be exclusive of other provisions for substitution permitted by law.

24. **Request for Notices.** Borrower requests that copies of the notices of default and sale be sent to Borrower's address

Page 6 of 8                                                                                          CAD10016 (10-07-98)

which is the Property Address.

**25. Statement of Obligation Fee.** Lender may collect a fee equal to the maximum amount as may from time to time be allowed by law for furnishing any statement of obligation, beneficiary's statement, beneficiary's demand or any other statement regarding the condition of or balance owing under the Note or secured by this Security Instrument.

**26. Offsets.** No indebtedness secured by this Security Instrument shall be deemed to have been offset or to be offset or compensated by all or part of any claim, cause of action, counterclaim or crossclaim, whether liquidated or unliquidated, which Borrower (or subject to Paragraph 17 of this Security Instrument, any successor to Borrower) now or hereafter may have or may claim to have against lender; and, in respect to the indebtedness now or hereafter secured hereby, Borrower waives, to the fullest extent permitted by law, the benefits of California Code of Civil Procedure Section 431.70 (and any successor laws) and any comparable or similar law of any other jurisdiction. Section 431.70 of the California Code of Civil Procedure provides as follows:

"Where cross-demands for money have existed between persons at any point in time when neither demand was barred by the statute of limitations, and an action is thereafter commenced by one such person, the other person may assert in the answer the defense of payment in that the two demands are compensated so far as they equal each other, notwithstanding that an independent action asserting the person's claim would at the time of filing the answer be barred by the statute of limitations. If the cross-demand would otherwise be barred by the statute of limitations, the relief accorded under this section is not available if the cross-demand is barred for failure to asset it in a prior action under Section 426.30. Neither person can be deprived of the benefits of this section by the assignment or death of the other. For the purposes of this section, a money judgment is a "demand for money" and, as applied to a money judgment, the demand is barred by the statute of limitations when enforcement of the judgment is barred under Chapter 3 (commencing with Section 683.010) of Division 1 of Title 9."

**27. Misrepresentation and Nondisclosure.** Borrower has made certain written representations and disclosures in order to induce Lender to make the loan evidenced by the Note or notes which this Security Instrument secures, and in the event that Borrower has made any material misrepresentation or failed to disclose any material fact, Lender, at its option and without prior notice or demand, shall have the right to declare the indebtedness secured by this Security Instrument, immediately due and payable. Trustee, upon presentation to it of an affidavit signed by Lender setting forth facts showing a default by Borrower under this paragraph, is authorized to accept as true and conclusive all facts and statements therein, and to act thereon hereunder.

**28. Time is of the Essence.** Time is of the essence in the performance of each provision of this Security Instrument.

**29. Waiver of Statute of Limitations.** The pleading of the statute of limitations as a defense to enforcement of this Security Instrument, or any and all obligations referred to herein or secured hereby, is hereby waived to the fullest extent permitted by law.

**30. Modification.** This Security Instrument may be modified or amended only by an agreement in writing signed by Borrower and Lender or lawful successors in interest.

**31. Construction of the Security Instrument.** Borrower and Lender agree that this Security Instrument shall be interpreted in a fair, equal, and neutral manner as to each of the parties, notwithstanding the provisions of Section 1654 of the California Civil Code. Section 1654 of the California Civil Code provides as follows:

"In the cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist."

**32. Reimbursement.** To the extent permitted by applicable law, Borrower shall reimburse Trustee and Lender for any and all costs, fees and expenses which either may incur, expend or sustain in the execution of the trust created hereunder or in the performance of any act required or permitted hereunder or by law or in equity or otherwise arising out of or in connection with this Security Instrument, the Note, any other note secured by this Security Instrument or any other instrument executed by Borrower in connection with the Note or Security Instrument. To the extent permitted by applicable law, Borrower shall pay to Trustee and Lender their fees in connection with Trustee and Lender including, but not limited to assumption application fees; fees for payoff demands and, statements of loan balance; fees for making, transmitting and transporting copies of loan documents, verifications, full or partial lien reconveyances and other documents requested by borrower or necessary for performance of Lender's rights or duties under this Security Instrument; fees arising from a returned or dishonored check; fees to determine whether the Property is occupied, protected, maintained or insured or related purposes; appraisal fees, inspection fees, legal fees, broker fees, insurance mid-term substitutions, repair expenses, foreclosure fees and costs arising from foreclosure of the Property and protection of the security for this Security Instrument; and all other fees and costs of a similar nature not otherwise prohibited by law.

**33. Clerical Error.** In the event Lender at any time discovers that the Note, any other note secured by this Security Instrument, the Security Instrument, or any other document or instrument executed in connection with the Security Instrument, Note or notes contains an error that was caused by a clerical mistake, calculation error, computer malfunction, printing error or similar error, Borrower agrees, upon notice from Lender, to reexecute any documents that are necessary to correct any such error(s).

CAD10017 (10-07-98)

Borrower further agrees that Lender will not be liable to Borrower for any damages incurred by Borrower that are directly or indirectly caused by any such error.

**34. Lost, Stolen, Destroyed or Mutilated Security Instrument and Other Documents.** In the event of the loss, theft or destruction of the Note, any other note secured by this Security Instrument, the Security Instrument or any other documents or instruments executed in connection with the Security Instrument, Note or notes (collectively, the "Loan Documents"), upon Borrower's receipt of an indemnification executed in favor of Borrower by Lender, or, in the event of the mutilation of any of the Loan Documents, upon Lender's surrender to Borrower of the mutilated Loan Document, Borrower shall execute and deliver to Lender a Loan Document in form and content identical to, and to serve as a replacement of, the lost, stolen, destroyed, or mutilated Loan Document, and such replacement shall have the same force and effect as the lost, stolen, destroyed, or mutilated Loan Documents, and may be treated for all purposes as the original copy of such Loan Document.

**35. Assignment of Rents.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property. Borrower shall have the right to collect and retain the rents of the Property as they become due and payable provided Lender has not exercised its rights to require immediate payment in full of the sums secured by this Security Instrument and Borrower has not abandoned the Property.

**36. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

☐ Adjustable Rate Rider          ☐ Condominium Rider                  ☐ 1-4 Family Rider
☐ No Prepayment Penalty Option Rider   ☐ Planned Unit Development Rider   ☐ Occupancy Rider
☒ Other(s) (specify) Interest Only Adjustable Rate Rider              ☐

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

_____          _____
JERRY   SAM                    -Borrower                              -Borrower

_____          _____
MELENIE   SAM                  -Borrower                              -Borrower

_____          _____
                               -Borrower                              -Borrower

_____[Space Below This Line For Acknowledgment]_____

State of California, County of_____}SS:

    On _____ before me,_____

personally appeared _____

_____
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

    Witness my hand and official seal.              Signature_____
    (Reserved for official seal)

                                                    _____
                                                    Name (typed or printed)
                                                    My commission expires:_____

Page 8 of 8
                                                                        CAD10018 (10-07-98)

Loan Number: 631012337     Servicing Number: 002101479-0     Date: 03/06/06

# INTEREST ONLY PAYMENT PERIOD RIDER

### THIS RIDER TO THE SECURITY INSTRUMENT PROVIDES FOR AN INITIAL PERIOD OF MONTHLY PAYMENTS OF INTEREST ONLY AND FOR SUBSEQUENT MONTHLY PAYMENTS OF BOTH PRINCIPAL AND INTEREST.

THIS INTEREST ONLY RIDER is made     March 06, 2006     , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to PROFFER FINANCIAL A CALIFORNIA CORPORATION, A CALIFORNIA CORPORATION (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

9535  PALAZZO DR,  STOCKTON, CA 95212-3519
[Property Address]

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

I. Section 3 of the Note is modified to provide for sixty (60) payments of interest only ("Interest Only Period") at the interest rates determined in accordance with Sections 2 and 4 of the Note.  Section 3 of the Note is modified as follows:

### 3. PAYMENTS
**(A) Time and Place of Payments**
I will pay interest during the Interest Only Period, and principal and interest thereafter during the Amortization Period, by making a payment every month.
**Interest Only Period** - The "Interest Only Period" is the period from the date of this Note through the 60th Monthly Payment     .
**Amortization Period** - The "Amortization Period" is the period after the Interest Only Period and continuing until the Maturity Date.
I will make my monthly payments on the first day of each month beginning on May 01, 2006     . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under the Note.  Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal.  If, on April 01, 2036     I still owe amounts under the Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make monthly payments at PROFFER FINANCIAL A CALIFORNIA CORPORATION
3636 NOBEL DR., SUITE #410, SAN DIEGO, CA  92122
or at a different place if required by the Note Holder.

**(B) Amount of My Interest Only Payments**
The first sixty (60) monthly payments will be in the full amount of U.S. $ 2,960.53     , which equals one twelfth (1/12th) of the amount of yearly interest due on the principal at the time the loan was made. These payments are called the "Interest Only Payments."
No payments of principal are due during the Interest Only Period.  The Interest Only Payments will not reduce the principal amount of the Note.  Additional payments of principal may be made in accordance with Section 5 of the Note.

*MULTISTATE INTEREST ONLY RIDER - Single Family - 5/25 ARM*
Page 1 of 2

USR1081.wp (03-24-05)

Loan Number: 631012337        Servicing Number: 002101479-0        Date: 03/06/06

**(C) Monthly Payment Changes**

During the Amortization Period, I will begin making principal and interest payments.

Beginning with the 61st payment, changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of the Note.

**II. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER** - Covenant 17 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**III.** All other provisions of the Security Instrument and any Rider are unchanged by this Rider to the Security Instrument for Interest Only Payments and remain in full force and effect.

## I understand that for the Interest Only Period I will not be reducing the principal balance. After 5 years if I only made my minimum payment, my principal balance will not be reduced.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Interest Only Payment Period Rider.

_____ (Seal)        _____ (Seal)
JERRY    SAM

_____ (Seal)        _____ (Seal)
MELENIE   SAM

_____ (Seal)        _____ (Seal)

*MULTISTATE INTEREST ONLY RIDER - Single Family - 5/25 ARM*
Page 2 of 2

USR1081.wp (03-24-05)

Loan Number:   631012337      Servicing Number:  002101479-0      Date:  03/06/06

## ADJUSTABLE RATE RIDER
### (LIBOR Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made  March 06, 2006                               ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Adjustable Rate Note (the "Note") to
    PROFFER FINANCIAL A CALIFORNIA CORPORATION, A CALIFORNIA CORPORATION
(the "Lender") of the same date and covering the property described in the Security Instrument and located
at:

9535  PALAZZO DR,   STOCKTON, CA 95212-3519

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST
RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE
BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE
MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**The Note** provides for an initial interest rate of           7.280%                    . The
Note provides for changes in the interest rate and the monthly payments, as follows:

4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES
      (A) Change Dates
      The interest rate I will pay may change on the first day of   April 01      2011             ,
and on that day every sixth month thereafter. Each date on which my interest rate could change is called a
"Change Date."
      (B) The Index
      Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the
average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market
("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first
business day of the month immediately preceding the month in which the Change Date occurs is called the
"Current Index."
      If the Index is no longer available, the Note Holder will choose a new index that is based upon
comparable information. The Note Holder will give me notice of this choice.
      (C) Calculation of Changes
      Before each Change Date, the Note Holder will calculate my new interest rate by adding
    SIX AND 10/100                          percentage point(s) ( 6.100%    )
to the Current Index. The Note Holder will then round the result of this addition to the next higher one-eighth
of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will

MULTISTATE ADJUSTABLE RATE RIDER-LIBOR INDEX - Single Family
Page 1 of 3

USRJ0021 (02-23-99)

Loan Number:  631012337      Servicing Number:  002101479-0      Date:  03/06/06

be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than    10.280%   or less than   7.280%                    . Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1.0%) from the rate of interest I have been paying for the preceding six months. In no event will my interest rate be greater than    13.280%             or less than   7.280%               .

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Covenant 17 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**MULTISTATE ADJUSTABLE RATE RIDER-LIBOR INDEX-Single Family**
Page 2 of 3

USRI0022 (02-23-99)

Loan Number:  631012337      Servicing Number:  002101479-0      Date:  03/06/06

     BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____(Seal)       _____(Seal)
JERRY   SAM                MELENIE   SAM

_____(Seal)       _____(Seal)

_____(Seal)       _____(Seal)

**MULTISTATE ADJUSTABLE RATE RIDER-LIBOR INDEX-Single Family**
Page 3 of 3

USRI0023 (02-23-99)

Complaint Exhibit "B"

 # Mortgage Litigation Consultants

9245 Laguna Springs Drive, Suite 200
Elk Grove, CA 95758
Phone: (916) 275-0907
Fax: (916) 244-7006
Email: dpereira@loandefects.com

| IMPORTANT LEGAL DEADLINES CONTAINED IN THIS CORRESPONDENCE[i] | | | |
|---|---|---|---|
| **Issue** | **Number of Days** | **Deadline** | **Statute** |
| Date to act on rescission (TILA) | 20 calendar days | 2/239/2009 | 15 U.S.C. §1635 (b) |
| Date to Acknowledge QWR (RESPA) | 20 business days | 3/03/2009 | 12 U.S.C. §2605(e)(1) |
| Date to answer QWR (RESPA) | 60 business days | 4/28/2009 | 12 U.S.C. §2605(e)(2) |

February 3, 2009

**Proffer Financial, a California Corporation**
**3636 Nobel Drive, Suite #410**
**San Diego, CA   92122**

**American Home Servicing**
**P.O. Box 631730**
**Irving, TX   75063-1730**

RE:   Proffer Loan No. 002101479-0
      AHS Loan No. 0021014790
      Jerry Sam and Melenie Sam
      9535 Palazzo Drive, Stockton, CA   95212

To Whom It May Concern:

Mortgage Litigation Consultants have been retained to represent Mr.
and Mrs. Sam.  Mr. and Mrs. Sam's signature to the attached
authorization (Exhibit "A") is notification to you of our
representation of them.

It is our belief that AMERICAN HOME MORTGAGE is not the owner nor
beneficiary nor note holder nor the master (security) servicer of the
above referenced loan.  We request all of the documents and
information contained in attached Exhibit "B", "Document/Information
Request."  Said requests are made pursuant to 15 U.S.C. §1641(f)(2)
and/or as a Qualified Written Request[ii] pursuant to RESPA.

The loan being serviced is defective.  Mr. and Mrs. Sam were provided
two copies of the Notice of Right to Cancel (copy attached as Exhibit

**Page 1 of 3**

"C"). For reasons unknown to us, the two copies contain no dates in the date of transaction and cancel date.  These are the only copies Mr. and Mrs. Sam ever received.

As such, this error of not providing the proper Notice of Right to Cancel with correct dates, as required by TILA, extends the right to cancel for 3 years. Since the loan was consummated on ~March 2006, we are within the 3 year period.

Since the Truth In Lending Act renders Mr. and Mrs. Sam's signature on the original Notice of Right to Cancel as a "rebuttable presumption" (15 U.S.C. § 1635(c)) that they did get the proper copies, we are giving you a copy of what was actually received from the closer. Possession of these incorrect copies, which has incorrect dates, <u>could only come from you, your predecessor(s) or your agents.</u>  As such, due to possession of these inaccurate Notices of Right to Cancel, we strongly feel that we have overcome the rebuttable presumption and are allowed to rescind.

Since this request includes a Qualified Written Request under RESPA which calls into question the valid collection of payments on a void mortgage and in light of this factual evidence, we would request that any response related to the rescission include a factual basis under which Mr. and Mrs. Sam would be provided these incorrect documents through your process or your predecessor(s) of complying with the Truth In Lending Act and what proper controls you have in place to prevent such an error.

We have been instructed by Mr. and Mrs. Sam to offer the following option to settle this rescission issue with AMERICAN HOME MORTGAGE:

• The first loan balance to be modified to the fair market value of the property.  We have determined the fair market value to be $235,000.00.
• A fixed interest rate for the first mortgage of 5.50%.
• The terms remain amortized over the term remaining.
• A full settlement agreement executed by both parties.
• Mr. and Mrs. Sam will pay their own costs for attorney fees to date.

Of course, we would be interested in a <u>reasonable counter proposal</u>. If you reject our settlement or we do not come to a resolution, by this letter, as instructed in the attached document by Mr. and Mrs. Sam, Mr. and Mrs. Sam <u>hereby rescinds the above referenced loan</u>.

In addition, Mr. and Mrs. Sam is asserting theirr rights under Section 805 of the Federal Fair Debt Collections Practices Act and the California Rosenthal's Fair Debt Collection Practices Act (applying to all creditors the Federal statute) in that they wish that all communications cease in relation to the debt except in the form of a written response to the request contained in this letter or those allowed per the statute.

Please send your response as follows:

        Mortgage Litigation Consultants
        9245 Laguna Springs Drive, Suite 200
        Elk Grove, CA  95758

While this letter has been sent as a Qualified Written Request under RESPA (as applicable) and you have 60 business days to respond to the QWR, <u>you must comply with the request under the Truth In Lending Act related to the rescission and identifying the true owners of the loan within twenty calendar days</u>.

If you should have any questions, please feel free to contact me at (916) 275-0907.

Sincerely,

David A. Pereira

---

[i] Failing to comply with these deadlines (individual or together) may result in a legal court filing without any further notice to enforce the statutes.  If you require more time to respond, please request an extension.  No extension is granted without our specific approval.

[ii] For purposes of this request being a Qualified Written Request under RESPA, since this letter contains rescission of the loan which renders the loan void, subject to damages and directly impacts of the lawful servicing of the loan, application of payments and the documentation related to servicing the loan to date, this request falls within Section 6 of RESPA as servicing is impacted.

# - EXHIBIT A -

### Third Party Authorization
### Agreement to Release
### Authorization to Rescind

Requested Party: _AMERICAN HOME MORTGAGE_ Acct. No. _002 101 4790_
Requested Party: _____ Acct. No. _____ _____
Requested Party: _____ Acct. No. _____ _____
Requested Party: _____ Acct. No. _____ _____

I/We, the undersigned, have retained attorney Kimberlee Rode to act as my attorney and Mortgage Litigation Consultants (herein "requestor"). For all purposes, I do hereby authorize any person or entity referenced above (herein "requested party") they provide this authorization to (herein "requested party"), to provide and release (for review or copy) or otherwise provide to requestor any and all public and non-public personal financial information contained in my accounts which may include, but is not limited to; loan balances, final payoff statement, loan status, payment history, payment activity, documents and/or property information.

**If required in my case, I hereby authorize "requestor" to rescind the loan and any rescission coming from the Law Offices of Kimberlee Rode or Mortgage Litigation Consultants, shall be considered as coming directly from me.**

_JERRY SAM_
Printed Customer Name

_Jerry San_                      _1/27/09_
Customer Signature                  Date

_Melenie San_
Printed Customer Name

_Melielie San_                   _1/27/09_
Customer Signature                  Date

# - EXHIBIT B -

# DOCUMENT/INFORMATION REQUEST

| Document or information Requested | Note Below |
|---|---|
| The **name, address and telephone number** of the owner/note holder/beneficiary/master servicer of the obligation. This request should be broadly interpreted to include the true owners and not merely a trustee or attorney in fact. | 1, 2, 3 |
| Copies of all assignments, recorded or unrecorded, purporting to evidence who has the beneficial interest of the security instrument and the corresponding owner of promissory note from the date of contract origination to date. | 3, 4, 5 |
| If the note contains a "blind endorsement" the name, address and telephone number of the person who has the note in their possession. | 3, 4, 5 |
| Copies of all documents from the beneficial holder that purports to grant authority or direction in which to service the above referenced loans. | 4, 5 |
| Copies of all securities documents using whatever security instrument in which the underlying debt was securitized. This includes any stripping of payment streams, principal, future value, derivatives, tranches or any other device or artifice related to the underlying debt. | 4, 5 |
| Copies of documents contained in your loan file that bears the signature of the borrower. | 4, 5 |
| Statement of all payments made on this loan. | 4, 5 |

## Note Legend

| Note 1 | Under 15 U.S.C. §1641 (f)(2), you are required to give the name of the "owner of the obligation or the master servicer of the obligation", the master servicer is the master servicer and securities administrator of a "Pooling and Servicing Agreement" or similar document. |
|---|---|
| Note 2 | Failing to provide us with the name, address and telephone number by the end of the rescission response time pursuant to 15 U.S.C. §1635(b) may result in a Declaratory Relief action to seek the proper party for litigating the rescission. |
| Note 3 | The borrower is entitled to know who they have a contract with. The requested information is not confidential information as is required to properly name the person who actually owns the obligation to properly litigate the disputes with the proper owner. |
| Note 4 | Request is a Qualified Written Request pursuant RESPA - 12 U.S.C. §2605(e)(B)<br><br>For purposes of this subsection, a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that—<br><br>(i)   includes, or otherwise enables the servicer to identify, the name and account of the borrower; and<br><br>(ii)  includes <u>a statement of the reasons for the belief of the borrower</u>, to the extent applicable, that the account is in error <u>or provides sufficient detail to the servicer regarding other information sought by the borrower.</u> |
| Note 5 | Pursuant to 12 U.S.C. §2605(e)(B)(ii), unrelated to the account being in error, this request "provides sufficient detail to the servicer regarding other information sought by the borrower." Since the borrower is rescinding the loan, this information is needed to properly pursue this remedy. |

# - EXHIBIT C -

Property Address:   9535  PALAZZO DR
STOCKTON, CA  95212-3519

**YOUR RIGHT TO CANCEL**

You are entering into a transaction that will result in a mortgage, lien, or security interest on/in your home.  You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

(1) the date of the transaction, which is _____; (i.e., the date you signed your loan documents) or
(2) the date you received your Truth in Lending disclosures; or
(3) the date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien, or security interest is also canceled.  Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien, or security interest on/in your home has been canceled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property.  If it is impractical or unfair for you to return the property, you must offer its reasonable value.  You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL:**

If you decide to cancel this transaction, you may do so by notifying us in writing,

Name of Creditor   PROFFER FINANCIAL A CALIFORNIA CORPORATION

at          3636 NOBEL DR., SUITE #410
SAN DIEGO, CA  92122

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below.  Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of _____ (or midnight of the third business day following the latest of three events listed above).  If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

I WISH TO CANCEL

_____         _____
Date                                      Consumer's Signature

ON THE DATE LISTED ABOVE I/WE THE UNDERSIGNED EACH RECEIVED TWO (2) COMPLETED COPIES OF THE NOTICE OF RIGHT TO CANCEL IN THE FORM PRESCRIBED BY LAW ADVISING ME/US OF MY/OUR RIGHT TO CANCEL THIS TRANSACTION.

Applicant  JERRY  SAM _____ Date     Co-Applicant MELENIE  SAM _____ Date

Applicant _____ Date     Co-Applicant _____ Date

Applicant _____ Date     Co-Applicant _____ Date

Page 1 of 1                                USD0011.wp (02-07-03)

Property Address:   9535  PALAZZO DR
STOCKTON, CA  95212-3519

YOUR RIGHT TO CANCEL
You are entering into a transaction that will result in a mortgage, lien, or security interest on/in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

(1) the date of the transaction, which is _____; (i.e., the date you signed your loan documents) or
(2) the date you received your Truth in Lending disclosures; or
(3) the date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien, or security interest is also canceled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien, or security interest on/in your home has been canceled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

HOW TO CANCEL:

If you decide to cancel this transaction, you may do so by notifying us in writing,

Name of Creditor   PROFFER FINANCIAL A CALIFORNIA CORPORATION

at            3636 NOBEL DR., SUITE #410
             SAN DIEGO, CA  92122
You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of _____ (or midnight of the third business day following the latest of three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

I WISH TO CANCEL

_____                    _____
        Date                                        Consumer's Signature

ON THE DATE LISTED ABOVE I/WE THE UNDERSIGNED EACH RECEIVED TWO (2) COMPLETED COPIES OF THE NOTICE OF RIGHT TO CANCEL IN THE FORM PRESCRIBED BY LAW ADVISING ME/US OF MY/OUR RIGHT TO CANCEL THIS TRANSACTION.

_____                    _____
Applicant  JERRY  SAM           Date         Co-Applicant  MELENIE  SAM          Date

_____                    _____
Applicant                       Date         Co-Applicant                        Date

_____                    _____
Applicant                       Date         Co-Applicant                        Date

Page 1 of 1                                                   USD0011.wp (02-07-03)

Complaint Exhibit "C"

# NOTICE OF RIGHT TO CANCEL

Transaction I.D. No.                                  Loan Number: 631012337    002101479-0

Borrowers: JERRY  SAM and MELENIE  SAM

Property Address:    9535  PALAZZO DR
                     STOCKTON, CA  95212-3519

**YOUR RIGHT TO CANCEL**

You are entering into a transaction that will result in a mortgage, lien, or security interest on/in your home.  You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

(1) the date of the transaction, which is _____; (i.e., the date you signed your loan documents) or
(2) the date you received your Truth in Lending disclosures; or
(3) the date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien, or security interest is also canceled.  Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien, or security interest on/in your home has been canceled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property.  If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL:**

If you decide to cancel this transaction, you may do so by notifying us in writing,

Name of Creditor     PROFFER FINANCIAL A CALIFORNIA CORPORATION

at                   3636 NOBEL DR., SUITE #410
                     SAN DIEGO, CA  92122

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below.  Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of _____ (or midnight of the third business day following the latest of three events listed above).  If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

_____                          _____
        Date                                          Consumer's Signature

ON THE DATE LISTED ABOVE I/WE THE UNDERSIGNED EACH RECEIVED TWO (2) COMPLETED COPIES OF THE NOTICE OF RIGHT TO CANCEL IN THE FORM PRESCRIBED BY LAW ADVISING ME/US OF MY/OUR RIGHT TO CANCEL THIS TRANSACTION.

_____                          _____
Applicant  JERRY  SAM          Date              Co-Applicant MELENIE  SAM          Date

_____                          _____
Applicant                      Date              Co-Applicant                       Date

_____                          _____
Applicant                      Date              Co-Applicant                       Date

USD0011.wp (02-07-03)

Complaint Exhibit "D"

Sam





Complaint Exhibit "E"

FORM L55 Discharge of Debtor (v.1.0)

09-27846 - B - 7

|  | **UNITED STATES BANKRUPTCY COURT**<br>Eastern District of California<br><br>**Robert T Matsui United States Courthouse**<br>**501 I Street, Suite 3-200**<br>**Sacramento, CA 95814**<br><br>(916) 930-4400<br>www.caeb.uscourts.gov<br>M-F 9:00 AM - 4:00 PM | **FILED**<br><br>**7/31/09**<br><br>CLERK, U.S. BANKRUPTCY COURT<br>EASTERN DISTRICT OF CALIFORNIA<br><br>lbes |
| --- | --- | --- |

## DISCHARGE OF DEBTOR

**Case Number:**   09-27846 - B - 7

Debtor Name(s), Social Security Number(s), and Address(es):

Jerry Sam
xxx-xx-0714

9535 Palazzo Dr
Stockton, CA 95212

Melenie Sam
xxx-xx-3198

9535 Palazzo Dr
Stockton, CA 95212

**OTHER NAMES USED WITHIN 8 YEARS BEFORE FILING THE PETITION:**

Chan Vathana Sam
Bayon Restaurant

Mean Neung
Bayon Restaurant

It appearing that the debtor is entitled to a discharge,

**IT IS ORDERED:**

The debtor is granted a discharge under section 727 of title 11, United States Code, (the Bankruptcy Code).

### SEE THE BACK OF THIS ORDER FOR IMPORTANT INFORMATION.

Dated:
7/31/09

For the Court,
Richard G. Heltzel , Clerk

Complaint Exhibit "F"



# Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior

## Servicer Compensation and its Consequences

*October 2009*

NATIONAL
**CONSUMER LAW**
CENTER INC
▲

# Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior: Servicer Compensation and its Consequences

*Written by*
*Diane E. Thompson*
Of Counsel
National Consumer Law Center

## ABOUT THE AUTHOR

Diane E. Thompson is Of Counsel at the National Consumer Law Center. She writes and trains extensively on mortgage issues, particularly credit math and loan modifications. Prior to coming to NCLC, she worked as a legal services attorney in East St. Louis, Illinois, where she negotiated dozens of loan modifications in the course of representing hundreds of homeowners facing foreclosure. She received her B.A. from Cornell University and her J.D. from New York University.

## ABOUT THE NATIONAL CONSUMER LAW CENTER

The National Consumer Law Center®, a nonprofit corporation founded in 1969, assists consumers, advocates, and public policy makers nationwide on consumer law issues. NCLC works toward the goal of consumer justice and fair treatment, particularly for those whose poverty renders them powerless to demand accountability from the economic marketplace. NCLC has provided model language and testimony on numerous consumer law issues before federal and state policy makers. NCLC publishes an 18-volume series of treatises on consumer law, and a number of publications for consumers.

## ACKNOWLEDGEMENTS

My colleagues at NCLC provided, as always, generous and substantive support for this piece. Carolyn Carter, John Rao, Margot Saunders, Tara Twomey, and Andrew Pizor all made significant contributions to the form and content of this paper. Thanks as well to Kevin Byers for reading and commenting on this piece. Particular thanks to Denise Lisio for help with the footnotes, to Tamar Malloy for work on the charts, and to Julie Gallagher for graphic design. All errors remain the author's.

© 2009 National Consumer Law Center® All rights reserved.
7 Winthrop Square, Boston, MA 02110
617-542-8010    www.consumerlaw.org

# TABLE OF CONTENTS

Executive Summary                                                                    v

Introduction                                                                         1

The Rise of the Servicing Industry as a By-Product of Securitization                 3

Securitization Contracts, Tax Rules, and Accounting Standards
Do Not Prevent Loan Modifications But Discourage Some
Modifications                                                                        5

The Only Effective Oversight of Servicers, by Credit Rating
Agencies and Bond Insurers, Provides Little Incentive for
Loan Modifications                                                                   14

Servicer Income Tilts the Scales Away from Principal
Reductions and Short Sales and Towards Short-Term Repayment
Plans, Forbearance Agreements, and Foreclosures                                      16

Servicer Expenditures Encourage Quick Foreclosures                                   23

Foreclosures vs. Modifications: Which Cost a Servicer More?                          25

Staffing                                                                             28

Refinancing and Cure                                                                 29

Conclusion and Recommendations                                                       29

Glossary of Terms                                                                    37

Notes                                                                                40

# FIGURES AND CHARTS

Percentage of Loans in Foreclosure, 1995–2009 — v, 1

Modifications, Foreclosures, and Delinquencies as a Percentage of 60+ Day Delinquencies in 4th Quarter, 2008 — vi, 30

Ocwen Asset Management Servicing Fees — vi, 18

Ocwen Asset Management Breakdown of Servicing Fees — vi, 18

Effect of Components of Servicer Compensation on Likelihood and Speed of Foreclosure — vii

HAMP Modifications as a Percentage of Delinquencies — viii, 30

Securitization Rate, 1990–2008 — 3

Income Glossary — 4

Expenses Glossary — 5

Securitization, Tax, and Accounting Glossary — 6

A Simplified Example of the Benefit to Servicers of Short-term Versus Permanent Modifications — 13

Ocwen Solutions Mortgage Services Fees — 18

Ocwen Solutions Process Management Fees Breakdown — 18

A Simplified Example of the Impact on Residuals of Delayed Loss Recognition for Principal Reductions — 21

A Simplified Example of the Advantage of Modifications That Permit Recovery of Advances — 24

Effect of Servicer Incentives on Default Outcomes — 31

# EXECUTIVE SUMMARY

The country is in the midst of a foreclosure crisis of unprecedented proportions. Millions of families have lost their homes and millions more are expected to lose their homes in the next few years. With home values plummeting and layoffs common, homeowners are crumbling under the weight of mortgages that were often only marginally affordable when made.

One commonsense solution to the foreclosure crisis is to modify the loan terms. Lenders routinely lament their losses in foreclosure. Foreclosures cost everyone—the homeowner, the lender, the community—money. Yet foreclosures continue to outstrip loan modifications. Why?

Once a mortgage loan is made, in most cases the original lender does not have further ongoing contact with the homeowner. Instead, the original lender, or the investment trust to which the loan is sold, hires a servicer to collect monthly payments. It is the servicer that either answers the borrower's plea for a modification or launches a foreclosure. Servicers spend millions of dollars advertising their concern for the plight of homeowners and their willingness to make deals. Yet the experience of many homeowners and their advocates is that servicers—not the mortgage owners—are often the barrier to making a loan modification.

Servicers, unlike investors or homeowners, do not generally lose money on a foreclosure. Servicers may even make money on a foreclosure. And, usually, a loan modification will cost the servicer something. A servicer deciding between a foreclosure and a loan modification faces the prospect of near certain loss if the loan is modified and no penalty, but potential profit, if the home is foreclosed. The formal rulemakers—Congress, the Administration, and the Securities and Exchange Commission—and the market participants who set the terms of engagement—credit rating agencies and bond insurers—have failed to provide servicers with the necessary incentives—the carrots and the sticks—to reduce foreclosures and increase loan modifications.



**Percentage of Loans in Foreclosure, 1995–2009**

*Sources:* Inside Mortgage Finance, The 2009 Mortgage Market Statistical Annual; Mortgage Banker's Association, National Delinquency Survey, Q2 09

### Modifications, Foreclosures, and Delinquencies as a Percentage of 60+ Day Delinquencies in 4th Quarter, 2008



Modifications Performed 4th Quarter 2008

Foreclosure Inventory 4th Quarter 2008 — 41%

3% — Modifications Performed 4th Quarter 2008

56% — 60+ Days Delinquent Unmodified, Not in Foreclosure

**The 60+ day delinquency rate for 4th quarter 2008 was 8.08% of all loans.**

*Sources:* Mortgage Banker's Association, National Delinquency Survey, Q4 08; Manuel Adelino, Kristopher Gerardi, and Paul S. Willen, Why Don't Lenders Renegotiate More Home Mortgages? Redefaults, Self-Cures, and Securitization, Table 3.

### Ocwen Asset Management  Servicing Fees



Process Management Fees — 11%

89% — Servicing and Subservicing Fees

*Source:* Ocwen Fin. Corp., Annual Report (Form 10-K) (Mar. 12, 2009)

### Ocwen Asset Management Breakdown of Servicing Fees



Other Commercial 0%
Loan Collection Fees 3%
Custodial Accounts (Float Earnings) 4%
Late Charges 15%
Commercial 8%
70% — Residential Loan Servicing and Subservicing

*Source:* Ocwen Fin. Corp., Annual Report (Form 10-K) (Mar. 12, 2009)

Servicers remain largely unaccountable for their dismal performance in making loan modifications.

Servicers have four main sources of income, listed in descending order of importance:

- The monthly servicing fee, a fixed percentage of the unpaid principal balance of the loans in the pool;

- Fees charged borrowers in default, including late fees and "process management fees";

- Float income, or interest income from the time between when the servicer collects the payment from the borrower and when it turns the payment over to the mortgage owner; and

- Income from investment interests in the pool of mortgage loans that the servicer is servicing.

Overall, these sources of income give servicers little incentive to offer sustainable loan modifications, and some incentive to push loans into foreclosure. The monthly fee that the servicer receives based on a percentage of the outstanding principal of the loans in the pool provides some incentive to servicers to keep loans in the pool rather than foreclosing on them, but also provides a significant disincentive to offer principal reductions or other loan modifications that are sustainable on the long term. In fact, this fee gives servicers an incentive to increase the loan principal by adding delinquent amounts and junk fees. Then the servicer receives a higher monthly fee for a while, until the loan finally fails. Fees that servicers charge borrowers in default reward servicers for getting and keeping a borrower in default. As they grow, these fees make a modification less and less feasible. The servicer may have to waive them to make a loan modification feasible but is almost always assured of collecting them if a foreclosure goes through. The other two sources of servicer income are less significant.

If servicers' income gives no incentive to modify and some incentive to foreclose, through increased fees, what about servicers' expenditures? Servicers' largest expenses are the costs of financing the advances they are required to make

to investors of the principal and interest payments on nonperforming loans. Once a loan is modified or the home foreclosed on and sold, the requirement to make advances stops. Servicers will only want to modify if doing so stops the clock on advances sooner than a foreclosure would.

Worse, under the rules promulgated by the credit rating agencies and bond insurers, servicers are delayed in recovering the advances when they do a modification, but not when they foreclose. Servicers lose no money from foreclosures because they recover all of their expenses when a loan is foreclosed, before any of the investors get paid. The rules for recovery of expenses in a modification are much less clear and somewhat less generous.

In addition, performing large numbers of loan modifications would cost servicers upfront money in fixed overhead costs, including staffing and physical infrastructure, plus out-of-pocket expenses such as property valuation and credit reports as well as financing costs. On the other hand, servicers lose no money from foreclosures.

The post-hoc reimbursement for individual loan modifications offered by Making Home Affordable and other programs has not been enough to induce servicers to change their existing business model. This business model, of creaming funds

### Effect of Components of Servicer Compensation on Likelihood and Speed of Foreclosure

| | Favors Foreclosure? | Likely Effect on Speed of Foreclosure? |
|---|---|---|
| **Structural Factors** | | |
| PSAs | Neutral | Speeds Up |
| Repurchase Agreements | Neutral | Slows Down |
| REMIC rules | Neutral | Neutral |
| FAS 140 | Slightly Favors Foreclosure | Neutral |
| TDR Rules | Slightly Favors Foreclosure | Neutral |
| Credit rating agency | Slightly Favors Foreclosure | Speeds Up |
| Bond insurers | Slightly Favors Foreclosure | Speeds Up |
| **Servicer Compensation** | | |
| Fees | Strongly Favors Foreclosure | Slows Down |
| Float Interest Income | Slightly Favors Foreclosure | Neutral |
| Monthly Servicing Fee | Strongly Favors Modification (but not principal reductions) | Slows Down |
| Residual Interests | Slightly Favors Modification (but not interest reductions) | Slows Down |
| **Servicer Assets** | | |
| Mortgage Servicing Rights | Neutral | Slows Down |
| **Servicer Expenses** | | |
| Advances | Strongly Favors Foreclosures | Speeds Up |
| Fee Advances to Third Parties | Slightly Favors Foreclosure | Speeds Up |
| Staff Costs | Strongly Favors Foreclosures | Speeds Up |

### HAMP Modifications as a Percentage of Delinquencies

| | |
|---|---|
| Total 60+ Days Delinquencies as of June 30, 2009 | 5,360,961 |
| HAMP Trial Modification Through September 30, 2009 | 487,081 |



☐ June 2009 60+ Day Delinquencies without a HAMP Modification

■ HAMP Trial Modifications as of September 30, 2009

*Sources:* Mortgage Banker's Association, National Delinquency Survey, Q2 09; Making Home Affordable Program, Servicer Performance Report Through September 2009

from collections before investors are paid, has been extremely profitable. A change in the basic structure of the business model to active engagement with borrowers is unlikely to come by piecemeal tinkering with the incentive structure.

In the face of an entrenched and successful business model, servicers need powerful motivation to perform significant numbers of loan modifications. Servicers have clearly not yet received such powerful motivation. What is lacking in the system is not a carrot; what is lacking is a stick. Servicers must be required to make modifications, where appropriate, and the penalties for failing to do so must be certain and substantial.

## Recommendations:

### 1. Avoid irresponsible lending.

We are now looking to loan modifications to bail us out of a foreclosure crisis years in the making. Had meaningful regulation of loan products been in place for the preceding decade,

we would not now be tasking servicers with rescuing us from the foreclosure crisis. Any attempt to address the foreclosure crisis must, of necessity, consider loan modifications. We should also ensure that we are not permanently facing foreclosure rates at current levels. To do so requires thorough-going regulation of loan products, as we have discussed in detail elsewhere.

### 2. Mandate loan modification before a foreclosure.

Congress and state legislatures should mandate consideration of a loan modification before any foreclosure is started and should require loan modifications where they are more profitable to investors than foreclosure. Loss mitigation, in general, should be preferred over foreclosure.

### 3. Fund quality mediation programs.

Court-supervised mortgage mediation programs help borrowers and servicers find outcomes that benefit homeowners, communities and investors. The quality of programs varies widely, however, and most communities don't yet have mediation available. Government funding for mediation programs would expand their reach and help develop best practices to maximize sustainable outcomes.

### 4. Provide for principal reductions in Making Home Affordable and via bankruptcy reform.

Principal forgiveness is necessary to make loan modifications affordable for some homeowners. The need for principal reductions is especially acute—and justified—for those whose loans were not adequately underwritten and either: 1) received negatively amortizing loans such as payment option adjustable rate mortgage loans, or 2) obtained loans that were based on inflated appraisals. As a matter of fairness and commonsense, homeowners should not be trapped in debt peonage, unable to refinance or sell.

The Making Home Affordable guidelines should be revised so that they at least conform to the Federal Reserve Board's loan modification program by

reducing loan balances to 125 percent of the home's current market value. In addition, Congress should enact legislation to allow bankruptcy judges to modify appropriate mortgages in distress.

### 5. Continue to increase automated and standardized modifications, with individualized review for borrowers for whom the automated and standardized modification is inappropriate.

One of the requirements of any loan modification program that hopes to be effective on the scale necessary to make a difference in our current foreclosure crisis is speed. The main way to get speed is to automate the process and to offer standardized modifications.

Servicers can and should present borrowers in default with a standardized offer based on information in the servicer's file, including the income at the time of origination and the current default status. Borrowers should then be free to accept or reject the modification, based on their own assessment of their ability to make the modified payments. Borrowers whose income has declined and are seeking a modification for that reason could then provide, as they now do under the Making Home Affordable Program, income verification. Only when a borrower rejects a modification—or if an initial, standard modification fails—should detailed underwriting be done.

The urgency of the need requires speed and uniformity; fairness requires the opportunity for a subsequent review if the standardized program is inadequate. Borrowers for whom an automated modification is insufficient should be able to request and get an individually tailored loan modification, at least when such a loan modification is forecast to save the investor money. Many of the existing loans were poorly underwritten, based on inflated income or a faulty appraisal. Borrowers may have other debt, including high medical bills, that render a standardized payment reduction unaffordable. Subsequent life events, including the death of a spouse, unemployment, or disability, may also make a standardized modification unsustainable. These subsequent, unpredictable events, outside the control of the homeowner, should not result in foreclosure if a further loan modification would save investors money and preserve homeownership.

### 6. Ease accounting rules for modifications.

The current accounting rules, particularly as interpreted by the credit rating agencies, do not prevent modifications, but they may discourage appropriate modifications. The requirements that individual documentation of default be obtained may prevent streamlined modifications. The troubled debt restructuring rules may discourage sustainable modifications of loans not yet in default, with the unintended consequence of promoting short-term repayment plans rather than long-term, sustainable modifications that reflect the true value of the assets. Finally, limiting recovery of servicer expenses when a modification is performed to the proceeds on that loan rather than allowing the servicer to recover more generally from the income on the pool as a whole, as is done in foreclosure, clearly biases servicers against meaningful modifications.

### 7. Encourage FASB and the credit rating agencies to provide more guidance regarding the treatment of modifications.

Investors, taken as a whole, generally lose more money on foreclosures than they do on modifications. Investors' interests are not necessarily the same as those of borrowers; there are many times when an investor will want to foreclose although a borrower would prefer to keep a home. Investors as well as servicers need improved incentives to favor modifications over foreclosures. Still, there would likely be far fewer foreclosures if investors had information as to the extent of their losses from foreclosures and could act on that information.

Even where investors want to encourage and monitor loan modifications, existing rules can stymie their involvement—or even their ability to get clear and accurate reporting as to the status of the loan pool. Additional guidance by FASB and the credit rating agencies could force servicers to disclose more clearly to investors and the public the nature and extent of the modifications in their portfolio—and the results of those modifications. Without more transparency and uniformity in accounting practices, investors are left in the dark. As a result, servicers are free to game the system to promote their own financial-incentives, to the disadvantage, sometimes, of investors, as well as homeowners and the public interest at large.

### 8. Regulate default fees.

Fees serve as a profit center for many servicers and their affiliates. They increase the cost to homeowners of curing a default. They encourage servicers to place homeowners in default. All fees should be strictly limited to ones that are legal under existing law, reasonable in amount, and necessary. If default fees were removed as a profit center, servicers would have less incentive to place homeowners into foreclosure, less incentive to complete a foreclosure, and modifications would be more affordable for homeowners.

# Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior

## Servicer Compensation and its Consequences

Diane E. Thompson
National Consumer Law Center

## Introduction

As the foreclosure numbers have spiraled upward over the last few years, policymakers and economists have come to a consensus that the national economy needs a massive reduction in the number of foreclosures, probably by modifying delinquent loans.[1] Everyone claims to be in favor of this: Congress, the President, the Federal Reserve Board, bankers. Yet the numbers of modifications have not kept pace with the numbers of foreclosures.[2]

At the center of the efforts to perform loan modifications are servicers.[3] Servicers are the companies that accept payments from borrowers. Servicers are distinct from the lender, the entity that originated the loan, or the current holder or investors, who stand to lose money if the loan fails. Some servicers are affiliated with the originating lender or current holder; many are not. Yet, while servicers normally have the power to modify loans, they simply are not making enough loan modifications. Why? One answer is that the structure of servicer compensation generally biases servicers against widespread loan modifications.

How servicers get paid and for what is determined in large part by an interlocking set of tax, accounting, and contract rules. These rules are then interpreted by credit rating agencies and bond insurers. Those interpretations, more than any individual investor or government pronouncement, shape servicers' incentives. While none of these rules or interpretations impose an absolute ban on loan modifications, as some servicers have alleged, they generally favor foreclosures over modifications, and short-term modifications over modifications substantial enough to



**Percentage of Loans in Foreclosure, 1995–2009**

*Sources:* Inside Mortgage Finance, The 2009 Mortgage Market Statistical Annual; Mortgage Banker's Association, National Delinquency Survey, Q2 09

be sustainable. Neither the formal rulemakers—Congress, the Administration, and the Securities and Exchange Commission—nor the market participants who set the terms of engagement—credit rating agencies and bond insurers—have yet provided servicers with the necessary incentives—the carrots and the sticks—to reduce foreclosures and increase loan modifications.

Servicers' incentives ultimately are not aligned with making loan modifications in large numbers. Servicers continue to receive most of their income from acting as automated pass-through accounting entities, whose mechanical actions are performed offshore or by computer systems.[4] Their entire business model is predicated on making money by lifting profits off the top of what they collect from borrowers. Servicers generally profit from: a servicing fee that takes the form of a fixed percentage of the total unpaid principal balance of the loan pool; ancillary fees charged borrowers—sometimes in connection with the borrower's default and sometimes not; interest income on borrower payments held by the servicer until they are turned over to the investors or paid out for taxes and insurance; and affiliated business arrangements.

Servicers, despite their name, are not set up to perform or to provide services.[5] Rather, they make their money largely through investment decisions: purchases of the right pool of mortgage servicing rights and the correct interest hedging decisions. Performing large numbers of loan modifications would cost servicers upfront money in fixed overhead costs, including staffing and physical infrastructure, plus out-of-pocket expenses such as property valuation and credit reports as well as financing costs.

Several programs now offer servicers some compensation for performing loan modifications, most significantly the Making Home Affordable program. Fannie Mae and Freddie Mac—market makers for most prime loans—have long offered some payment for loan modifications. Other investors have sometimes done likewise, and some private mortgage insurance companies make small payments if a loan in default becomes performing, as does the FHA loan program. Yet none of these incentives has been sufficient to generate much interest among servicers in loan modifications.[6]

Post-hoc reimbursement for individual loan modifications is not enough to induce servicers to change an existing business model. This business model, of creaming funds from collections before investors are paid, has been extremely profitable. A change in the basic structure of the business model to active engagement with borrowers is unlikely to come by piecemeal tinkering with the incentive structure. Indeed, some of the attempts to adjust servicers' incentive structure have resulted in confused and conflicting incentives, with servicers rewarded for some kinds of modifications, but not others.[7] Most often, if servicers are encouraged to proceed with a modification at all, they are told to proceed with both a foreclosure and a modification, at the same time. Until recently, servicers received little if any explicit guidance on which modifications were appropriate and were largely left to their own devices in determining what modifications to make.[8]

In the face of an entrenched and successful business model and weak, inconsistent, and post-hoc incentives, servicers need powerful motivation to perform significant numbers of loan modifications. Servicers have clearly not yet received such powerful motivation.

A servicer may make a little money by making a loan modification, but it will definitely cost it something. On the other hand, failing to make a loan modification will not cost the servicer any significant amount out-of-pocket, whether the loan ends in foreclosure or cures on its own. Servicers remain largely unaccountable for their dismal performance in making loan modifications.

Until servicers face large and significant costs for failing to make loan modifications and are actually at risk of losing money if they fail to make modifications, no incentive to make modifications will work. What is lacking in the system is not a carrot; what is lacking is a stick.[9] Servicers

must be required to make modifications, where appropriate, and the penalties for failing to do so must be certain and substantial.

## The Rise of the Servicing Industry as a By-Product of Securitization

Once upon a time, it was a wonderful life.[10] In this prediluvian America, those that owned the loan also evaluated the risk of the loan, collected the payments, and adjusted the payment agreement as circumstances warranted. In this model, in most circumstances, lenders made money by making performing loans, borrowers had unmediated access to the holder of their loan, and both lenders and borrowers had in-depth information about local markets. Even if few bank owners or managers were as singularly civic-minded as George Bailey, they were at least recognizable individuals who could be appealed to and whose interests and incentives, if not always aligned with those of borrowers, were mostly transparent.

This unity of ownership, with its concomitant transparency, has long since passed from the home mortgage market. Loans are typically originated with the intention of selling the loan to investors. Loans may be sold in whole on the secondary market, so one investor ends up with the entire loan, but, more commonly, the loans are securitized. The securitization process transforms home loans into commodities, with ownership and accountability diffused.

In securitization, thousands of loans are pooled together in common ownership. Ownership is held by a trust. The trust is usually set up as a bankruptcy-remote entity, which means that the notes cannot be seized to pay the debts of the originator if the originator goes bankrupt. Bonds are issued to investors based on the combined expected payment streams of all the pooled loans. Bonds may be issued for different categories of payments, including interest payments, principal payments, late payments, and prepayment penalties.[11] Different groups of bond holders—or tranches—may get paid from different pots of money and in different orders.[12] The majority of all home loans in recent years were securitized.

Securitization—and the secondary market for mortgage loans more generally—has created a relatively new industry of loan servicers. These entities exist to collect and process payments on mortgage loans. Some specialize in subprime loans; some specialize in loans that are already in



Securitization Rate, 1990–2008

*Sources:* Inside Mortgage Finance, The 2009 Mortgage Market Statistical Annual

default (so-called special servicers). Some companies contain entire families of servicers: prime and subprime, default and performing. Some of these servicers are affiliated with the originators—nearly half of all subprime loans are serviced by either the originator or an affiliate of the originator[13]—but many are not. Even when the servicer is affiliated with the originator, it no longer has exclusive control over the loan or an undivided interest in the loan's performance. Servicers are usually collecting the payments on loans someone else owns.

Servicers bid for the right to service pools of mortgages at the time the mortgage pool is created. Most securitization agreements (pooling and servicing agreements or PSAs) specify a master servicer, who coordinates the hiring of various subservicers, including default servicers as needed. Once the master servicer is set in the PSA, the master servicer typically is entitled to receive a portion of the payments on the pool of mortgages serviced until those mortgages are paid off. Usually, the master servicer cannot be replaced, absent both gross malfeasance in the performance of its duties and concerted action by a majority of investors.

Borrowers see none of this. Instead, a borrower typically knows who originated the loan and to whom the borrower sends her payments. Borrowers—and even judges, the press, and academics—often refer to the payment recipient as the "lender." In fact, though, the entity receiving the borrower's payments is not necessarily "the" lender or even "a" lender. Instead, the payment recipient is a servicer. It is the servicer, not the lender or holder, who will have the records of payments; it is the servicer who will know of a default; and it is through the servicer that any request for a loan modification must pass.

The servicer's function is to collect the payments. Once the payments are collected, the servicer passes them on to a master servicer, a trustee, or the securities administrator,[14] which then disburses them to the investors. Although the servicer may have some connection with the loan originator, or some interest in the pooled

---

### INCOME GLOSSARY

**Affiliates** Related business organizations, with common ownership or control.

**Float Income** The interest income earned by servicers in the interval between when funds are received from a borrower and when they are paid out to the appropriate party.

**Mortgage Servicing Rights (MSRs)** The rights to collect the payments on a pool of loans.

**Residual Interest** A junior-level interest retained in the mortgage pool by a servicer, typically by a servicer who is an affiliate of the originator. These interests commonly pay out "surplus" interest income, left over after specified payments to senior bond holders are made.

---

loans, servicers are primarily neither originators of loans nor holders of loans.

Originators sometimes retain the servicing rights on loans they securitize. Not all originators have servicing divisions, however. Even those originators that have servicing divisions do not always retain the servicing rights.

Servicers affiliated with the sponsors of the securitization or originators of the pooled loans commonly retain at least some junior interests in the pool. In theory, retention of these interests increases servicers' incentives to maximize performance. These junior tranches held by servicers are usually interest-only: if there is "excess" or "surplus" interest, then the servicer receives that interest income. If the servicer collects no more interest income than is required to satisfy the senior bond obligations, then the servicer receives nothing.

Servicers' incentives thus are neither those of the investors—the beneficial owners of the mortgage note—nor the borrowers. Nor are their concerns necessarily the same as those of the loan originator.

Servicers are not paid strictly speaking on the performance of loans. Instead, servicers derive their compensation from a complex web of direct payments based on the principal balance of the pool of loans, fees charged borrowers, interest

income on the float between when payments are received from borrowers and when they are passed on, residual interests in the pool, and often some income from other hedging devices, including bonds on other pools of mortgages and more exotic financial instruments. Servicers may rack up extra compensation through affiliated businesses, such as insurance companies or property valuation and inspection companies, with whom they contract for various services, the costs of which are passed on to borrowers.[15] These affiliated companies sometimes specialize in providing services for loans that are in default—giving servicers a way of profiting even from loans that are belly up.[16]

Offset against servicers' income are their expenses, which servicers, as rational corporate actors, attempt to keep as low as possible.[17] Expenses include financing the advances made to the trusts on nonperforming loans,[18] occasional obligations under repurchase agreements, and staff. Servicers' largest expense, albeit a noncash expense, is the amortization of their mortgage servicing rights.[19]

These competing financial pressures do not necessarily provide the correct incentives from the perspectives of investors, borrowers, or society at large. In particular, servicers' incentives generally bias servicers to foreclose rather than modify a loan.

---

### EXPENSES GLOSSARY

Advances Under most PSAs, servicers are required to advance the monthly principal and interest payment due on each loan to the trust, whether or not the borrower actually makes the payment. The requirement to make these advances can continue until the home is sold at foreclosure.

Repurchase Agreement A clause in a contract for the sale of mortgages that requires the seller or servicer to repurchase any mortgage back from the buyer if any one of a number of specified events occur. Generally the specified events include borrower default or legal action and sometimes include modification.

---

## Securitization Contracts, Tax Rules, and Accounting Standards Do Not Prevent Loan Modifications But Discourage Some Modifications

### Overview

The large pools of securitized mortgages are governed by an interlocking set of tax and accounting rules, repeated in the trusts' governing documents. These rules do not forbid loan modifications. Some of these rules do, however, restrict the circumstances in which loans can be modified or create certain disincentives for loan modifications.

These rules are designed to ensure that the assets of the trust—the notes and mortgages—are passively managed. Passive management is required because the trusts receive preferential tax treatment. So long as the trust complies with these rules, the trust does not have to pay tax on its income, thus freeing more income for the ultimate investors. Compliance with the rules also provides investors in these trusts with some protection from the bankruptcy of the entity, usually the mortgage originator, that transfers the mortgages into the securitized trust. Without these protections from bankruptcy, creditors of the originator could seize mortgage loans from the trust to satisfy the originator's debts.

In the past, there was widespread concern that tax and accounting rules might prevent modifications. Servicers often cited these rules as a reason for their failure to perform modifications. The concern that the tax and accounting rules, and their embodiment in the trusts' governing documents, were preventing modifications was always largely overblown, at least for individual modifications of loans actually in default. Recent clarifications to both the tax and accounting rules have eased most significant limitations on modifications. Modification of a mortgage that is in default or for which default is reasonably foreseeable will seldom trigger adverse tax or accounting consequences.

## SECURITIZATION, TAX, AND ACCOUNTING GLOSSARY

**FAS** Financial Accounting Statement, issued by FASB. The Financial Accounting Statements, through their incorporation into private contracts and SEC regulation, have the force of law.

**FASB** Financial Accounting Standards Board FASB is a private organization, but the Securities and Exchange Commission often interprets FASB standards and requires compliance with the FASB standards by all public companies.

**FAS 140** Accounting rules governing transfer of assets to and from trusts, designed to limit discretion in trust management in exchange for preserving the bankruptcy-remote status of the trust.

**Junior Tranche, Junior Interest** An interest in a pool of mortgages that gets paid after more senior security interests.

**Pooling and Servicing Agreement (PSA)** The agreement between the parties to the securitization as to how the loans will be serviced. PSAs spell out the contractual duties of each party, the circumstances under which a servicer can be removed, and sometimes give guidance as to when modifications can be performed.

**REMIC** Real Estate Mortgage Investment Conduits are defined under the U.S. Internal Revenue Code, and are the typical vehicle of choice for the pooling and securitization of mortgages. The REMIC rules are the IRS tax code rules governing REMICs.

**Repurchase Agreement** A clause in a contract for the sale of mortgages which requires the seller or servicer to repurchase any mortgage back from the buyer if one of a number of specified events occur. Generally the specified events include borrower default or legal action and sometimes include modification.

**Tranche** One of a number of related classes of securities offered as part of the same transaction.

**Troubled Debt Restructuring (TDR)** An accounting term describing the modification of debt involving creditor concessions (a reduction of the effective yield on the debt) when the borrower is facing financial hardship.

**Trustee** The legal holder of the mortgage notes, on behalf of the trust and the ultimate beneficiaries, the investors in the trust.

Some PSAs impose restrictions on the nature or number of loan modifications. The most common limitation on modifications is a five percent cap on loan modifications, either of unpaid principal balance or number of loans, measured as of the pool's formation. Although some subprime pools surpass that percentage in default and foreclosure,[20] few, if any, servicers reach or even approach that percentage of modifications in the pool as a whole.[21] As a recent Congressional Oversight Panel determined, after reviewing several of the pools containing the five percent cap, "the cap is not the major obstacle to successful modifications."[22] A small percentage of PSAs forbid modifications, but many of these have been amended.[23] Some of the PSAs that limit modifications only do so for loans that remain in the pool. In that case, the servicer may modify as many loans as it chooses, so long as it is prepared to purchase the modified loans out of the loan pool.

None of the existing tax and accounting rules or PSAs yet provide clear and comprehensive guidance for servicers or investors in terms of how to account for modifications or which modifications are preferred.[24] The rules set some basic outer bounds: modifications must be done when default is actual or imminent; there must be some individual review and documentation of the impending default; no group of investors should dictate any particular loan modification; and modification should inure to the benefit of the trust as a whole. The rules have all been updated in the last few years to encourage modifications.

The following subsections take a detailed look at the contract, tax, and accounting rules, in that order.

## Neither PSAs nor Investor Action Block Loan Modifications

Pooling and servicing agreements (PSAs) spell out the duties of a servicer, how the servicer gets paid, and what happens if the servicer fails to

perform as agreed. What control investors exercise over the servicer is usually contained in the PSA. While much has been made of the limitations imposed by these PSAs, there is wide variation in how much detail they give. Most PSAs impose no meaningful restrictions—or guidance—on individual loan modifications.[25] Common types of loan modifications, including principal forbearance, are not even mentioned in most PSAs.[26] Modifications are generally permissible, so long as they are in accordance with the "usual and customary industry practice." The result is that servicers are generally left to their own discretion in approving, analyzing, and accounting for modifications.

### Current PSA Limitations on Loan Modifications Are Few and Far Between

Of those PSAs that do limit loan modifications, most provide only general guidance, such as limiting the total amount of loan modifications to five percent or requiring loans to be in default or at imminent risk of default before being modified.[27] Some PSAs, primarily those involving loans originated by Countrywide prior to 2007, require the servicer to buy all modified loans out of the pool, thus avoiding any potential REMIC or FAS 140 issues.[28] Even in the early Countrywide loan pools, the repurchase requirement has not posed a significant hurdle to modifications. In many instances, the repurchase requirement appears to be waived for loans in default.[29]

Probably no more than 10% of all subprime loans are in pools that originally prohibited all material modifications.[30] Where the PSAs provided meaningful limits on the abilities of servicers to perform modifications, those limits have been eased. Sponsors of securitizations have successfully petitioned the trustee to amend the provisions barring modifications to allow modifications generally, so long as the loan is in default or at imminent risk of default.[31] Similarly, although there is no evidence that the five percent cap on modifications was ever the reason

that servicers failed to perform modifications,[32] those limits are being lifted in PSAs as well.[33] Credit rating agencies have made clear that they will not count modified loans that are performing 12 months after modification against the five percent cap.[34] Thus, the modification caps are transformed from an absolute limit to a limit on the number that can be modified within any twelve-month period. Finally, securitizations of Countrywide loans in 2007 and later distinguished between modifications that triggered the "troubled debt restructuring" standard and more modest modifications that would permit loans to be repackaged and resecuritized, thus avoiding the repurchase requirement in the Countrywide securitizations.[35]

A more widespread—and persistent—problem is that many PSAs require the servicer to proceed with foreclosure at the same time that it pursues a loan modification,[36] increasing the servicer's and borrower's costs and potentially undermining any offered loan modification. This issue is discussed in more detail later in this paper.

### Investors Seldom Can or Do Influence the Servicer's Actions on Loan Modifications

Nominally, the servicer works at the behest of the investors, through the trustee. PSAs will usually set out the servicer's duties and the remedies of the investors, acting through the trustee, should the servicer breach those duties.[37] Servicers are required by the PSA to act in the interests of the investors taken as a whole.

In large subprime pools there may be hundreds of investors, who have differing views of what the appropriate response to a pending foreclosure is.[38] Some investors may favor more aggressive loan modification to prevent foreclosures; others may prefer a quick foreclosure.[39] Nor do all investors share the pain of a default equally. For most subprime securities, different investors own different parts of the security—principal payments, interest payments, or prepayment penalties, for example—and get paid in different orders depending on their assigned priority. The higher

the priority of payment, the higher the certificate's credit rating, in general, and the more investors are willing to pay for it in relation to its return. Depending on the priority of payment and whether or not a modification reduces interest or principal payments, two investors in the same pool may fare very differently from a modification, with one investor seeing no change in payments and the other investor having its payments wiped out completely.[40]

Investors, unsurprisingly, are typically more focused on receiving the expected return on their certificates than the details of loan modifications, even where loan modifications have a large impact on the pool as a whole. Moreover, obtaining information about the nature and extent of loan modifications is not easy, even for investors.[41] Determining how those loan modifications impact the return on any one security may be even harder. Similarly, the sometimes substantial fees paid to servicers in foreclosure tend to be invisible to investors.[42]

Even when investors would favor modifications over foreclosure, they generally do not have authority to directly control servicer actions. Investors can usually only take action against a servicer through the trustee and then only if a majority of the investors agree.[43] Partly as a result of this common action problem, investors seldom give servicers guidance on how or when to conduct loss mitigation.[44] Trustees, on behalf of the trust, can in exceptional cases fire a servicer, but this right is rarely invoked, usually only when the servicer is no longer able to pay the advances of the monthly payments on the loans.[45] Thus, although servicers are nominally accountable to investors, investors have, in most cases, little control over the servicer's decisions about how to handle delinquencies and whether and how to offer loan modifications.[46]

### Servicers Face No Realistic Threat of Legal Liability for Making Loan Modifications

Servicers have claimed to fear investor law suits. Securitization, by design, favors some investors over others, depending on which piece of the securitization, or tranche, an investor has bought. Tranches are rated for their presumed credit-worthiness; the higher the rating, the more stable and predictable the return is presumed to be. Loan modifications that spread the loss evenly across all investors are likely to be met with howls of outrage from the highest-rated tranches.[47] Most influential investors would like the lower-rated tranches, often owned by the servicer, to bear the brunt of the cost of loan modifications. On the other hand, the servicer may have a financial interest in sparing the lower-rated tranches. Loan modifications that favor one group of investors over another could potentially give rise to a successful suit against a servicer by investors.

Fears of legal liability were always overblown. Such suits are vanishingly rare and face significant hurdles.[48] Among other hurdles, a significant number of investors have to agree to sue the servicer.[49] The PSAs themselves largely authorize modifications when doing so is in accordance with standard industry practices. Moreover, under recent federal legislation, servicers are now immunized from investor litigation when they make modifications in accordance with standard industry practice or government programs such as Making Home Affordable.[50] Of course, servicers often should—and occasionally do—make loan modifications that go beyond standard industry practice, and neither federal law nor most PSAs provide protection for innovative loan modifications, even if they are in the best interests of investors. Nonetheless, the fact remains that of all the lawsuits filed by investors in 2008, not a single one questioned the right of a servicer to make a loan modification.[51]

### Reliance on Industry Standards Slows the Pace of Innovation in Loan Modifications

But this standard creates a problem: how do you move an entire industry to begin making loan modifications when current standard industry practice is to do none? Reliance on standard industry practices as the benchmark of permissible